UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO. 23-CV-80505-ROSENBERG

| | |
|---|---|
| JULIE A. SU,<br>Acting Secretary of Labor,<br>United States Department of Labor<br><br>      *Plaintiff*,<br><br>  v.<br><br>MEDI-WHEELS OF THE PALM BEACHES,<br><br>      *Defendant*. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**CONCISE STATEMENT OF MATERIAL FACTS FOR WHICH PLAINTIFF CONTENDS THERE IS NO GENUINE ISSUE TO BE TRIED**

As required by Local Rule 56.1, Plaintiff Julie A. Su, Acting Secretary of Labor, United States Department of Labor (the "Secretary"), hereby sets forth the following concise statement of material facts for which Plaintiff contends there is no genuine issue to be tried.

Each statement of fact is supported by a citation to one or more of the following documents attached as numbered Exhibits hereto: (1) excerpts from the deposition of Dominick Tocci, Chief Financial Officer of Defendant Medi-Wheels, and attached Exhibits ("Tocci [pg:ln]"); (2) excerpts from the deposition of Mariela Vega, Owner and President of Defendant Medi-Wheels, and attached Exhibits ("Vega [pg:ln]"); (3) the declaration of Wage and Hour Investigator ("WHI") Said Silwany and attached Exhibits ("Silwany ¶_"); (4) excerpts from the deposition of driver Johnny Suazo ("J. Suazo [pg:ln]"); (5) excerpts from the deposition of driver Diogenes Suazo ("D. Suazo [pg:ln]"); and (6) Defendant's Amended Verified Answers to Plaintiff's First Set of Interrogatories ("Response to ROG __"). The Secretary also relies upon Defendant's admissions its Answer, ECF No. 18 ("ECF No. 18/Answer ¶_").

1

Unless specified otherwise, the facts set forth below refer to the time period for which the Secretary seeks back wages, i.e., June 20, 2020 through December 1, 2022 [hereinafter referred to as the "Relevant Time Period"].

## Jurisdiction, Venue, and Enterprise Coverage Under the Act

1. This Court has jurisdiction over this action pursuant to §§ 16(c) and 17 of the Act and 28 U.S.C. §§ 1331 and 1345. (ECF No. 18/Answer ¶ 1).

2. Defendant does business in Palm Beach County, Florida. (ECF No. 18/Answer ¶¶ 2, 3).

3. During the Relevant Time Period, Defendant provided non-emergency medical transport services to patients needing rides to medical appointments.[1] (ECF No. 18/Answer ¶ 9; Tocci Depo. at 14:1-15:4).

4. Such enterprise, employing employees handling, selling or otherwise working on goods or materials that have been moved in or produced for commerce; and having an annual gross volume of sales made or business done of not less than $500,000, constitutes an enterprise engaged in commerce, within the meaning of § 3(s)(1)(A) of the Act. (Response to ROG 1 and 2 (explaining that although Defendant disputes the employment status of the Drivers, Defendant does not contest enterprise coverage under the FLSA)).

5. The gross annual dollar value (ADV) for Medi-Wheels in 2020, 2021 and 2022 exceeded $500,000 each year.   (ECF No. 18/Answer ¶ 7).

6. Defendant and its Drivers handled or otherwise worked with goods that have moved in commerce (e.g., cell phones, electronic tablets, fire extinguishers, first aid kits). (Silwany ¶ 29).

---

[1] Medi-Wheels also provides transportation services at Palm Beach International Airport and for Palm Tran Connection, a transportation service for disabled individuals in Palm Beach County.  Medi-Wheels treats its drivers providing these services as employees and pays them an hourly wage. (Tocci Depo. 14:1-15:14). This litigation involves only the drivers Medi-Wheels considered to be "independent contractors" listed on Amended Appendix A (the "Drivers"), all of whom provided non-emergency medical transport services.

7. Mariela Vega started the business Medi-Wheels in 2011, initially with a contract with Palm Beach County to provide transportation services to disabled individuals. (Vega 11:13-12:4).

8. Until 2020, Medi-Wheels considered all of its drivers to be employees and paid them an hourly wage. (Vega 15:1-16:4).

9. In or around 2020, Medi-Wheels entered contracts with several insurance providers ("Providers") to provide non-emergency medical transport services.[2] (Vega 15:6-13).

10. Through these contracts, the Providers agreed to pay Medi-Wheels a set fare for rides provided, consisting of a base amount and an additional amount per mile over 10 for longer trips. (e.g., Vega Ex. 2 at DEF000427; Tocci 23:17-24:10).

    **(1) Medi-Wheels' Control over the Drivers' Work:**

11. Medi-Wheels had 19 of the 59 Drivers sign "agreements" in which the Driver purportedly agreed to be considered an independent contractor ("IC Agreement"); the majority of the Drivers had only a verbal agreement. (Tocci 77:22-78:5; Tocci Ex. 4; Vega 56:3-58:15).

12. The IC Agreements automatically renewed each year. (Tocci Ex. 4 at DEF000079; Tocci 76:2-6).

13. Drivers were hired and could be fired by Defendant's CFO Dominick Tocci and/or President/Owner Mariela Vega. (Response to ROG 15).

14. Medi-Wheels hired dispatchers who assigned and scheduled the work of the Drivers. (Response to ROG 15; Vega 54:1-55:5).

15. Most Drivers and dispatchers had worked for Mr. Tocci when he was comptroller at Yellow Cab, and he hired them based on his prior experience with them. (Tocci 41:7-42:20; Vega 24:4-11).

---

[2] Starting in May 2020, Medi-Wheels entered into contracts to provide non-emergency medical transport services with the following Providers doing business as: Access2Care, MTM, Epic MD/Alivy, Access On Time, Transcom Solutions, and Ride2MD. (Tocci 22:5-23:9)

16. Medi-Wheels kept a "Driver file" for every Driver which contained documentary proof of the Driver's eligibility to work under the Providers' contracts including all necessary licensing, clean driving record, criminal background checks, drug screen records, and proof of completion of required on-line training (such as CPR and defensive driving). (See e.g., Tocci Ex. 3; Vega 26:6-27:15; 41:1-25).

17. Medi-Wheels required the Drivers to follow the protocols of the Providers they serviced, including completing certain forms and receiving training. (See Tocci Ex. 3, Tocci 45:10-49:24 (explaining that "[these forms were] part of [Logisticare's] items that they sent us, these pre-formatted forms, and said that this is what you need from the driver in order to work on the contract.").

18. Medi-Wheels notified Drivers when any necessary certification or license was about to expire and required them to keep current certifications and licenses. (Vega 23:20-24; 41:7-18).

19. Medi-Wheels required the Drivers' vehicles to meet the minimum standards of its Providers and required the Drivers to produce their vehicles for inspection initially and periodically thereafter. (Vega 33:11-25; J. Suazo 60:4-10; D. Suazo 30:17-31:7, 32:15-33:22).

20. Medi-Wheels required the Drivers and their vehicles to be covered under its commercial insurance policy and provided the necessary "vehicle permit" required by law for the Drivers to operate their vehicles as a vehicle-for-hire. (Tocci Ex. 4 at DEF000085-87; Tocci 59:20-61:1; 75:1-10; 123:1-9).

21. Every day, Medi-Wheels put into the Transitrak application (1) information from all of the Providers regarding the rides Medi-Wheels had to provide the next day; and (2) the availability of the Drivers. Transitrak then created the daily routes, which the dispatchers reviewed for correctness and assigned to the Drivers. (Tocci 78:11-18; 89:17-22; 91:3-93:2)

4

22. The Drivers received their assigned routes for the following day each evening through the Transitrak application; this application told the Driver the time and location for his or her assigned pick-ups and drop-offs for the following day. (Tocci 93:3-24; D. Suazo 71:18-72:4)

23. Medi-Wheels required the Drivers to pick up their riders at the assigned place and time and to deliver the rider to the assigned destination within a certain time of the scheduled appointment. (Vega 32:15-33:4, Vega Ex. 2 at DEF000404; J. Suazo 56:3-12).

24. Because the purpose of Medi-Wheels' business is to deliver patients for medical appointments, there is little flexibility in when the driver could arrive/depart. (Vega 29:13-16, Vega Ex. 11 at DEF000640-642 (Provider contract with Medi-Wheels setting forth detailed requirements for "Pick Up and Delivery Standards")).

25. If the Driver was late or missed a pick-up, the Provider contracting with Medi-Wheels could assess liquidated damages against Medi-Wheels; Medi-Wheels would pass these damages on to the Driver. (Response to ROG 14; Tocci 26:5-22, 97:17-20; Vega Ex. 2 at DEF000428-429; Vega Ex. 11 at DEF000657; Silwany ¶ 8).

26. Once Medi-Wheels made the route assignment, the Driver was expected to perform the trips on the route; the Driver need not press "accept" in the application and had no way to reject all or portions of his assigned route through the application. (Tocci 79:4-15, 94:21-95:18).

27. In practice, Drivers did not reject their assigned routes or portions of their assigned routes unless there was an emergency. (D. Suazo 57:13-59:13; J. Suazo 58:24-59:5; Vega 59:19-60:7).

28. The only way Drivers made money was by successfully completing their assigned rides; Drivers were paid nothing if the rider did not show up for a trip. (Tocci 114:3-14).

29. If a Driver was unable to complete any of his assigned rides, he was required to contact Medi-Wheels' dispatchers so that the ride could be reassigned. (Tocci 82:15-18).

30. During the workday, if Medi-Wheels needed to assign an individual ride, it could "see if there was somebody in the area doing something" and "go into Transitrak and … assign that trip" to the nearby Driver. (Tocci 85:7-16).

31. Medi-Wheels required its Drivers to record within the Transitrak application certain work tasks, including when they arrived at the pick-up site and when they completed the passenger drop-off. (Tocci 103:19-25; J. Suazo 42:2-8; D. Suazo 80:19-24).

32. Medi-Wheels only paid the Drivers for trips that were completed and logged as complete within the Transitrak application. (Tocci 114:12-23).

33. Medi-Wheels had the ability to track its Drivers using GPS. (Tocci 100:25-102:2; Vega Ex. 11 (Logisticare contract at DEF000640 requires: "Provider shall maintain and utilize a GPS system that is capable of providing real-time data for member pick up and drop off times…")).

34. Medi-Wheels required Drivers to keep cameras in their vehicles, which Medi-Wheels could access. (J. Suazo 59:2-18; D. Suazo 24:13-19, 61:2-5).

35. Medi-Wheels required Drivers to wear a uniform shirt identifying them as "Medi-Wheels" drivers. (Tocci 69:13-25; D. Suazo 74:3-9; J. Suazo 58:21-23).

36. Medi-Wheels required Drivers to affix a magnetic "Medi-Wheels" sign on their vehicles. (Vega 36:11-25; D. Suazo 74:10-75:3)

37. Medi-Wheels required Drivers to have specific equipment and safety devices in their vehicles. (Vega 34:16-36:5).

38. On days Drivers worked, Medi-Wheels typically assigned Drivers back-to-back rides for the full day. (D. Suazo 52:1-53:13; Tocci 104:1-12; J. Suazo 44:23-45:16; Silwany ¶ 16a, 26).

39. Drivers often did not have time for a meal break or even to use the bathroom. (D. Suazo 50:15-51:25 ("In this type of work, in transportation, […] the drivers don't even have time to go to the

6

bathroom to pee. In my case and the majority of the drivers, we even carry our own lunches so that we can eat."); J. Suazo 44:23-45:16).

40. Based on the Transitrak data and interviews with Drivers, Drivers did not have time to work for other companies such as Uber or Lyft. (Silwany ¶ 25; D. Suazo 26:2-4; 68:23-69:14).

41. Medi-Wheels did not build "break time" into the Drivers' assigned routes. (Tocci 105:1-5).

**(2) Opportunity for profit or loss depending on their managerial skill:**

42. The Providers paid Medi-Wheels a set amount per trip based on their contracts with Medi-Wheels. (*See, e.g.,* Vega Ex. 2 at DEF000427; Tocci 23:12-24:10).

43. The Drivers did not have control over which trips were assigned to them. (D. Suazo 72:22-24; J. Suazo 58:14-20).

44. Drivers did not accept or reject individual rides within their assigned routes to craft a more profitable route. (D. Suazo 72:25-73:5, 79:2-80:8; J. Suazo 57:24-58:5).

45. Drivers did not know exactly how much each ride paid when it was assigned. (D. Suazo 72:11-21, 41:14-15 ("I didn't know if to picking up that gentleman that I was going to get paid $50 or I was going to get paid $15."); J. Suazo 56:13-23).

46. At the end of each week, Medi-Wheels provided the Drivers with a "pay sheet" showing the rides they completed that week with the fare earned for each ride; the pay sheet includes the deductions taken by Medi-Wheels for that week, including the flat licensing fee, the 5% voucher fee, and any additional charges or liquidated damages charges. (Tocci 39:24-40:2; Tocci Ex. 7)

47. The Driver did not know how much each ride paid until he received his pay sheet at the end of the work week.  (D. Suazo 72:16-21; Tocci Ex. 7).

**(3) The alleged employee's investment in equipment or materials required for his task, or his employment of workers:**

48. Many Drivers who worked for Medi-Wheels used their own personal vehicles. (Response to ROG 9; D. Suazo 28:6-12; J. Suazo 54:1-8).

49. Medi-Wheels required its Drivers to purchase a fire extinguisher, first-aid kit, and other small items to be carried in the vehicles; Drivers could purchase these items from Medi-Wheels, and Medi-Wheels deducted the cost from their paychecks. (Response to ROG 14; J. Suazo 23:13-19).

50. Drivers paid for their own gas and vehicle maintenance. (D. Suazo 28:19-21, 29:20-25).

51. Medi-Wheels required its Drivers to purchase its commercial liability insurance, which allowed them to get a vehicle-for-hire permit required by law. (Tocci 123:1-9; Tocci Ex. 4 at DEF000085-87; J. Suazo 26:16-27:6).

52. Only one of the 59 Drivers at issue was known by Medi-Wheels to employ a "helper;" the other 58 drivers did not employ a helper or assistant. (Tocci 64:16-65:25).

53. If a Driver did hire a helper, Medi-Wheels' IC Agreement required that any helpers meet the same requirements and submit the same paperwork as the Driver. (Tocci Ex. 4 at DEF000082-83).

54. Medi-Wheels paid all of the Drivers in their individual capacity; the Drivers did not work through an LLC or other incorporated entity. (Tocci 137:16-23; J. Suazo 53:10-13).

**(4) Whether the service rendered requires a special skill:**

55. Medi-Wheels required Drivers to have a valid driver's license, pass a physical examination and drug test, undergo a criminal background check, and have a clean driving record. (Vega 27:6-10).

56. Medi-Wheels also required the Drivers to provide documentation that they passed on-line certification courses for CPR, PASS, and defensive driving. (Vega 41:1-25).

**(5) The degree of permanency and duration of the working relationship:**

57. Medi-Wheels performed work using the Drivers between late May 2020 and December 1, 2022, approximately 30 months. (Silwany ¶ 27; Tocci 135:3-25).

58. Averaging the tenure of the 59 Drivers at issue, the average length of employment with Medi-Wheels was approximately 11 months, with 24 Drivers working for one year or longer. (Silwany ¶ 28).

59. The Drivers did not work for other employers during their tenure with Medi-Wheels; indeed, most Drivers worked such long hours that engaging in additional employment/business ventures would have been nearly impossible. (D. Suazo 26:2-4; 68:23-69:14; Tocci 137:12-15 (admitting that he has no "hard evidence" of whether Drivers were also working for Uber or Lyft).

**(6) The service rendered is an integral part of the alleged employer's business:**

60. During the Relevant Time Period, approximately a quarter of Medi-Wheels' revenues were derived from the work these 1099 Drivers performed. (Response to ROG 19).

61. Medi-Wheels also employed – and continues to employ – drivers it classifies and pays as employees to perform other contract work for the Palm Beach International Airport and Palm Beach County. (Tocci 136:4-14).

**Recordkeeping Violations, Overtime Violations, Minimum Wage Violations - Back Wages and Liquidated Damages**

62. Medi-Wheels did not pay the Drivers overtime premium pay rate for hours worked over 40 in any given workweek during the Relevant Time Period. (Silwany ¶ 10).

63. Medi-Wheels paid the Drivers the entire fare from the Provider for each completed ride, then deducted a flat "lease fee" each week (regardless of the amount of fares earned that week), as well as a 5% "voucher" fee. (Response to ROG 14; Silwany ¶ 6; Tocci 24:18-25:12).

64. For some Drivers, Medi-Wheels also deducted weekly amounts as reimbursement for equipment it had sold to the Driver (i.e., fire extinguisher, etc.). (Response to ROG 14; Silwany ¶ 7).

65. In some weeks, Medi-Wheels deducted "liquidated damages" or "late fee" of $50 or more, for the Driver's non-compliance with Medi-Wheels' rules. (Response to ROG 14; Silwany ¶ 8, Ex. A and

B).

66. Medi-Wheels did not compensate Drivers at all for time they spent driving with an empty car between passenger pick-ups or for time spent to pick-ups where the passenger cancels or doesn't show up. (J. Suazo 57:1-58:3; Tocci 114:3-14).

67. Medi-Wheels' deductions from the Drivers' weekly gross pay often exceeded $400 per week, resulting in certain work weeks in which wages fell below minimum wage. (Silwany ¶ 9).

68. Defendant did not keep records of Drivers' hours-worked. (Tocci 116:20-117:10; Silwany ¶ 10).

69. In discovery, Medi-Wheels produced a spreadsheet containing the data from the trip-assignment application Transitrak, used to assign and track the rides Medi-Wheels assigned to the drivers. Medi-Wheels required the Drivers to indicate within the Transitrak application when they arrived at the pick-up site and when they completed the passenger drop-off. (Silwany ¶ 11-12).

70. Using the Transitrak data, the Secretary computed the hours-worked for all the Drivers as follows:
    a. For each Driver on every day during the relevant time-period, the Secretary identified the earliest "start" time and the latest "stop" time indicated in the spreadsheet.
    b. These times indicate when the Driver first and last recorded a work-event within the Transitrak application on any given day. (Silwany ¶ 15).

71. The Secretary computed each Driver's daily hours-worked as including all time between the first and last event recorded by the Driver in the Transitrak application each day because:
    a. The Transitrak data shows that Drivers did not have much time between their assigned trips.
    b. The Drivers also reported that they generally had little time between their assigned trips.
    c. Medi-Wheels admits that it did not build in meal-breaks or other protected break time in the Drivers' days when assigning their daily routes. (Silwany ¶ 16).

72. The Drivers often worked in excess of 40 hours per work week. (Silwany ¶ 17).

73. For weeks in which the Driver worked in excess of 40 hours, the Secretary computed the Driver's hourly wage rate for the week (before deductions), then computed the overtime back wages owed by multiplying the hours-worked-over-forty by half of the applicable hourly wage rate. (Silwany ¶ 18).

74. For weeks in which the deductions reduced the Driver's net hourly wage rate below the federal minimum wage, the Secretary computed minimum wage back wages owed by deducting wages paid from the product of [the federal minimum wage ($7.25/hour) x hours worked]. (Silwany ¶ 19).

75. For weeks in which the Driver worked over forty hours *and* the employer's deductions reduced the driver's net hourly wage rate below the federal minimum wage, the Secretary computed back wages owed by deducting net wages paid from what the driver should have received under the minimum wage [i.e., ($7.25/hour) x hours worked], and computed overtime back wages owed by multiplying the hours-worked-over-forty by half of the applicable Florida minimum wage rate. (Silwany ¶ 20).

76. The Secretary computes that for the time between June 20, 2020 and December 1, 2022, Medi-Wheels owes the 59 Drivers listed on Amended Appendix A back wages totaling $26,446.14 for violations of Section 6 of the Act, and back wages totaling $358,143.32 for violations of Section 7 of the Act.  (Silwany ¶ 21-23).

77. Defendant tolled the Act's statute of limitations as of June 24, 2022. (Silwany ¶ 24, Exh.D).

78. Medi-Wheels did not consult with any third-party or refer to any Wage and Hour publications or guidance to determine whether its classification of the Drivers as independent contractors complied with the FLSA. (Response to ROG 13; Vega 16:12-15; Tocci 20:19-21:10).

ADDRESSES:

Office of the Solicitor
U. S. Department of Labor
61 Forsyth Street, S.W.
Room 7T10
Atlanta, GA  30303
(404) 302-5435
(404) 302-5438 (FAX)

**Office of the Solicitor**
**U. S. Department of Labor**

SEEMA NANDA
Solicitor of Labor

TREMELLE I. HOWARD
Regional Solicitor

KRISTIN R. MURPHY
Acting Counsel

By: *s/ Lydia J. Chastain*
  LYDIA J. CHASTAIN
  Senior Trial Attorneys

**Attorneys for Plaintiff.**

12

## CERTIFICATE OF SERVICE

I certify that on February 5, 2024, the foregoing Concise Statement of Material Facts for Which Plaintiff Contends There Is No Genuine Issue to Be Tried with supporting Exhibits 1 through 6 were filed using the CM/ECF system and served on Defendant's counsel of record as follows:

Richard D. Tuschman, Esq.
Richard D. Tuschman, P.A.
rtuschman@gtemploymentlawyers.com

Mark J. Beutler, Esq.
Law Offices of Mark J. Beutler, P.A.
mjb@mjbpa.com

*/s/ Lydia J. Chastain*
LYDIA J. CHASTAIN
Senior Trial Attorney

SOL Case No. 22-00245