**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

**CASE NO. 23-CV-80505-ROSENBERG**

| | |
|---|---|
| JULIE A. SU, | ) |
| Acting Secretary of Labor, | ) |
| United States Department of Labor | ) |
| | ) |
| *Plaintiff*, | ) |
| | ) |
| v. | ) |
| | ) |
| MEDI-WHEELS OF THE PALM BEACHES, | ) |
| INC., | ) |
| | ) |
| *Defendant*. | ) |

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANT**
**MEDI-WHEELS OF THE PALM BEACHES, INC.**
**AND SUPPORTING MEMORANDUM OF LAW**

NOW COMES Plaintiff Julie A. Su, Acting Secretary of Labor, U.S. Department of Labor (the "Secretary" or "Plaintiff"), and moves for entry of Judgment against Defendant Medi-Wheels of the Palm Beaches, Inc. (hereinafter "Medi-Wheels" or "Defendant"), pursuant to Rule 56 of the Federal Rules of Civil Procedure.

## I.        INTRODUCTION

As described more fully herein, the evidence and undisputed facts of this case establish the following as a matter of law:

(1)      Under the "economic realities" test, the drivers who are the subject of this litigation (hereinafter the "Drivers") are employees – not independent contractors – of Defendant Medi-Wheels as meant by the Fair Labor Standards Act of 1938 (the "Act" or the "FLSA").

(2)      Defendant is subject to "enterprise coverage," as meant by § 3(r) of the Act.

(3)      Defendant violated §§ 6, 7, 11(c) and 15(a)(5) of the Act, 29 U.S.C. § 201, *et seq*.

1

(4)    As a direct result of its violations of §§ 6 and 7 of the Act, 29 U.S.C. § 201, *et seq.*, Defendant is liable to 59 employees for **$384,589.46** in back wages from June 20, 2020 to December 1, 2022.

(5)    Defendant is also liable to 59 employees for **$384,589.46** in liquidated damages from June 20, 2020 to December 1, 2022.

(6)    The Secretary is entitled to an injunction permanently barring Defendant, its agents, servants, employees and all persons in active concert or participation with them from violating the provisions of §§ 6, 7, 11(c) and 15(a)(5) of the Act.

(7)    As a matter of law, Defendant's asserted affirmative defenses cannot succeed.

Accordingly, the Secretary moves for entry of a Judgment and Order finding all of the above as a matter of law.  In the alternative, the Secretary moves for entry of Judgment and Order as to any of the individual items above.

## II.  RELEVANT LEGAL AUTHORITIES

### A.    Standard for Summary Judgment

Summary judgment should be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A genuine issue of material fact exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).  Summary judgment is particularly appropriate when "the only genuinely disputed issue is [a] legal question." *Central Oil & Supply Corp. v. United States*, 557 F.2d 511, 515 (5th Cir. 1977).

**B.      Fair Labor Standards Act**

Congress enacted the Fair Labor Standards Act ("FLSA" or "the Act") in 1938 "in order to eliminate 'labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers.' " *Antenor v. D & S Farms,* 88 F.3d 925, 929 (11th Cir. 1996) (quoting 29 U.S.C. §§ 202(a) & (b)).  To those ends, Section 7 requires that covered employers pay time and a half for those hours that an employee works in excess of the standard forty-hour work week, 29 U.S.C. § 207(a)(1), Section 6 requires that employers pay a minimum hourly wage, 29 U.S.C. § 206, and Sections 11(c) and 15(a)(5) require that employers keep accurate and complete payroll and timekeeping records, 29 U.S.C. §§ 211(c) and 215(a)(5).

An employer who violates the minimum wage, overtime, and recordkeeping provisions of the FLSA, 29 U.S.C. §§ 215-216, is liable for the payment of back wages resulting from those violations, as well as equal amount of liquidated damages pursuant to § 216(c). Section 217 allows the Secretary to seek a permanent injunction, enjoining the employer from future violations.

### III.      ANALYSIS

**1.  As a matter of law, under the "economic realities" test, the Drivers who are the subject of this litigation are employees – not independent contractors – of Defendant.**

It is undisputed that Defendant classified the Drivers who are the subject of this litigation as independent contractors and did not pay them overtime rates for hours worked over forty in a workweek, as is required by employers under Section 7 of the Act.  Therefore, whether Defendant is an "employer" of the Drivers under the Act is the central issue in this case.  For the reasons stated below, the evidence – even considered in the light most favorable to Defendant –

leads inexorably to the conclusion that Medi-Wheel's Drivers are employees as meant by the FLSA.

The FLSA defines "employ" as including "to suffer or permit to work." 29 U.S.C. § 203(g). The Supreme Court has observed that this definition of an employment relationship is "the broadest definition that has ever been included in any one Act." *United States v. Rosenwasser,* 323 U.S. 360, 363 n. 3 (1945); *see also Rutherford Food Corp. v. McComb,* 331 U.S. 722 (1947) (holding that the term "employee" as used in the FLSA must be given a broad meaning and that "[w]here the work done, in its essence, follows the usual path of an employee, putting on an 'independent contractor' label does not take the worker from the protections of the Act").

To determine whether an individual falls into the category of covered "employee" or exempted "independent contractor," courts look to the "economic reality" of the relationship between the alleged employee and alleged employer and whether that relationship demonstrates dependence. *Scantland v. Jeffry Knight, Inc.*, 721 F.3d 1308, 1311 (11th Cir. 2013); *Pena v. Handywash,* 28 F.Supp.3d 1289, 1301 (S.D. Fla. 2014); *Aidone v. Nationwide Auto Guard, LLC,* 985 F.Supp.2d 1346, 1349 n. 1 (S.D. Fla. 2013) ("An employee is an individual 'who as a matter of economic reality [is] dependent upon the business to which [he] render[s] service.'"). No single factor is dispositive; rather, a court must consider the totality of the circumstances. *See Scantland*, 721 F.3d at 1312.

The Eleventh Circuit applies the following multifactor test to guide the "economic reality" inquiry: (1) the nature and degree of the alleged employer's control as to the manner in which the work is to be performed; (2) the alleged employee's opportunity for profit or loss depending upon his managerial skill; (3) the alleged employee's investment in equipment or

materials required for his task, or his employment of workers; (4) whether the service rendered requires a special skill; (5) the degree of permanency and duration of the working relationship; (6) the extent to which the service rendered is an integral part of the alleged employer's business. *Scantland*, 721 F.3d at 1312. While these factors serve as a guide, the overarching focus of the inquiry is economic dependence. *Id.* (citing *Usery v. Pilgrim Equip. Co.*, 527 F.2d 1308, 1311-12 (5th Cir. 1976)) ("The ... tests are aids—tools to be used to gauge the degree of dependence of alleged employees on the business with which they are connected. It is *dependence* that indicates employee status.") (emphasis in original). Ultimately, in considering economic dependence, courts focus on "whether an individual is in business for himself or is dependent upon finding employment in the business of others." *Id.* at 1312.

### (1) Medi-Wheels Exerted Considerable Control Over the Drivers and their Work. [See Material Facts 10-41].

Control is measured by whether the employer or worker dictates the "'meaningful' economic aspects of the business." *See Hopkins v. Cornerstone America*, 545 F.3d 338, 343 (5th Cir. 2008); *Gaye v. TJD Transp.*, 2019 WL 2603290, at *3 (S.D. Tex. June 25, 2019) (driver was employee despite providing refreshments for his vehicles and choosing routes because he drove on assignment and lacked control over prices and other decisions); *Acosta v. Senvoy, LLC*, 2018 WL 3722210, at *5 (D. Or. July 31, 2018) (employer controlled work by requiring drivers log in, receive list of stops, and respond within 15 minutes); *Flores v. Velocity Express, LLC*, 250 F.Supp.3d 468, 472-73 (N.D. Cal. 2017) (employer controlled customer expectations, timing of work, and performance of work); *Ingram v. Passmore*, 175 F. Supp. 3d 1328, 1336-37 (N.D. Ala. 2016) (employer controlled drivers' return of paperwork, requests for time off, and assignment and manner of work, among other tasks).

Defendant controlled the meaningful aspects of Drivers' work. It required many of the Drivers to sign pre-drafted contracts and all of the Drivers paid Medi-Wheels non-negotiable license and voucher fees. Drivers were required to log in to the Transitrak application to receive trips, drove only on assignment, and could not control rates. Defendant controlled whom Drivers drove, where trips originated and ended, and the timing of trips; it required door-to-door service and required Drivers to use a dispatch-application which tracked Drivers' locations. It required Drivers to provide and maintain specific certifications, to be covered by its liability insurance, and to operate under its vehicle-for-hire permit. The Drivers had only a limited window in which to arrive for a scheduled pick-up.  Medi-Wheels charged the Drivers a penalty if they were late or caused a rider to miss an assigned appointment.  It required its Drivers to make their vehicles available for regular inspection and required[1] the vehicle to contain specific equipment and meet minimum standards of cleanliness and safety. Medi-Wheels could and did control the appearance of its Drivers and their vehicles: it required Drivers to wear a "Medi-Wheels" shirt and to place a large magnetic "Medi-Wheels" sign on both sides of their vehicle.  In addition, Defendant supervised its Drivers. The nature of Medi-Wheels' work is different from work at a fixed job site. A supervisor cannot ride along on each trip. However, via the app, dispatchers tracked Drivers throughout the workday, and Drivers were in frequent contact with dispatch to receive trips and instructions. Medi-Wheels required Drivers to keep a camera in their vehicles, which

---

[1] Defendant may argue their client-Providers, and not Medi-Wheels, established many of these requirements for Drivers. However, courts have soundly rejected such "blame-shifting arguments." *Benion v. LeCom, Inc.*, 336 F. Supp. 3d 829, 853 (E.D. Mich. 2018) (rejecting argument that Comcast-imposed requirements were "characteristic of the industry"); *Acosta v. Off Duty Police Servs., Inc.*, 915 F.3d 1050, 1060-61 (6th Cir. 2019) (finding employer exerted control even though performance was controlled, in part, by customer instructions); *Keller v. Miri Microsystems, LLC*, 781 F.3d 799, 814 (6th Cir. 2015) (noting jury could find employer controlled job performance despite defendant requiring technicians comply with customer's specifications); *Scantland*, 721 F.3d at 1316 ("business needs cannot immunize employers from the FLSA's requirements").  Defendant cannot avoid properly classifying and paying Drivers by arguing they were required to meet minimum standards of its own clients.

Medi-Wheels could access.  Daily supervision and continuous monitoring is not necessary to demonstrate control. *See Brock v. Superior Care*, 840 F.2d 1054, 1060 (2d Cir. 1988) ("An employer does not need to look over his workers' shoulders every day in order to exercise control."); *Herman v. RSR Sec. Servs*., 172 F.3d 132, 140 (2nd Cir. 1999) (finding control where employer hired employees and occasionally supervised and controlled schedules and conditions of work); *see Irizarry v. Catsimatidis*, 722 F.3d 99, 111 (2d Cir. 2013).  Rather, "control may be restricted, or exercised only occasionally without removing the employment relationship from the protections of the FLSA." *Id.*; *see also Donovan v. Janitorial Servs., Inc.*, 672 F.2d 528, 531 (5th Cir. 1982) (stating "that [the employer] exercised that authority only occasionally ... does not diminish the significance of its existence").  The level of necessary supervision also depends on the nature and skills required for the work. *Acosta v. Off Duty Police Servs., Inc.,* 915 F.3d 1050, 1061 (6th Cir. 2019) (routine traffic and security work warranted only periodic supervision). Drivers had some limited discretion, such as which route to take to a pick-up, but Medi-Wheels had control over all meaningful aspects of the Drivers' work, including driver and vehicle appearance, the assignment of the work, the timing of work, and the equipment needed to perform the work.  As the Fifth Circuit has explained when applying the right to control factor under FLSA's economic realities test, "the lack of supervision over minor regular tasks cannot be bootstrapped into an appearance of real independence." *Usery v. Pilgrim Equip. Co*., 527 F.2d 1308, 1312 (5th Cir. 1976).

 Courts presented with similar facts have found that the "control" element has been met. *See, e.g., Collinge v. IntelliQuick Deliv., Inc.*, 2015 WL 1299369, at *4 (D. Ariz. Mar. 23, 2015) (finding employer met 'control' element because it "regulate[d] what the drivers are required to do, within which 'time frame' they must do it, what they are required to wear, and which

equipment they must use," unilaterally assigned pick-ups, and monitored its drivers "using a system which allowed [the employer] to know where its drivers were at all times and communicate with them."); *Flores v. Velocity Express, LLC*, 250 F.Supp.3d 468 (N.D. Ca. 2017) (finding employer met 'control' element because, *inter alia*, it required drivers to wear a uniform and place signate on their vehicles, gave drivers a manifest each day that told them what packages to deliver by what time, and required drivers to complete a DOT-required road test and obtain insurance that complied with the employer's requirements). This factor strongly weighs in favor of employee status.

**(2) The Drivers Had Little Opportunity for Profit or Loss Depending Upon Managerial Skill. [See Material Facts 38-47].**

This factor considers whether workers had opportunities for profit or loss based on managerial skill. *See Schultz v. Capital Int'l Sec., Inc*., 466 F.3d 298, 307 (4th Cir. 2006); *Collinge,* 2015 WL 1299369, at *4 (finding no opportunity because drivers' pay was capped by what employer paid and employer assigned deliveries). A worker's ability to increase revenue by simply working more does not distinguish an independent contractor from an employee. *Velocity Express*, 250 F.Supp.3d at 487; *Dole v. Snell*, 875 F.2d at 809 (finding working on a piecework basis more akin to earning wages than opportunity for profit); *Kansas City Transp. Grp.*, 2012 WL 3753736, at *9 (analogizing drivers' ability to earn more by taking more routes to waiters' ability to earn more through additional shifts). And, although a Driver may realize some cost-savings by selecting a fuel-efficient vehicle or avoiding tolls, there is little 'managerial skill' involved in these decisions. *Collinge*, 2015 WL 1299369, at *5. Likewise, the ability to earn more based on efficiency does not constitute managerial skill. *See Scantland*, 721 F.3d at 1317. There is also no opportunity for profit or loss when a worker is working a significant number of hours for one company. *See Senvoy, LLC*, 2018 WL 3722210, at *8.

Here, Defendant had sole control over Drivers' opportunity for profit and loss, and Drivers lacked managerial discretion. Drivers' opportunity for profit or loss was constrained by the fact Medi-Wheels assigned all trips. Drivers did not bid on or independently seek trips and were not apprised of all available trips. Drivers only saw trips they were assigned and did not even know how much their assigned trips would pay until they received their pay sheets at the end of the week. Further, Drivers' pay was capped by pre-determined trip rates negotiated between Medi-Wheels and the Providers.

Defendant may argue Drivers could decline trips, both within their assigned routes or as they were offered in the workday, and hope for more profitable ones; however, the evidence shows (1) Drivers did not reject trips within their daily assigned routes to craft more profitable routes, and (2) Medi-Wheels primarily assigned individual trips based on the app ranking the closest available Driver. Even assuming arguendo that Defendant allowed the Driver to decline the first trip, the next one was not guaranteed to be more profitable. Moreover, Drivers' ability to accept more trips or work more efficiently are insufficient. Drivers *had* to accept trips to afford Medi-Wheels' weekly licensing fees. Their ability to work more efficiently, if that even constituted managerial discretion, was also limited. Drivers transported vulnerable passengers and could not speed or skip providing door-to-door service to shorten trips. Drivers' long workweeks also limited their ability to work elsewhere and recognize a profit. This factor supports employee status.

### (3) The Drivers Did Not Employ Workers and their Capital Investment Did Not Contribute to their Economic Independence. [See Material Facts 48-54].

With one exception, the Drivers did not hire their own employees. Even if a Driver were to hire a helper, Medi-Wheels' IC Agreement required that any helpers meet the same requirements and meet the same standards as the Driver hired directly by Medi-Wheels. Under

such circumstances, the Eleventh Circuit has held that the ability to hire "helpers" is illusory. *Scantland*, 721 F.3d at 1317 (noting that "any helpers were required to be contracted with Knight as technicians, thus precluding the exercise of any real managerial skill over such helpers").

Regarding investment in equipment or materials, the Drivers predominantly used their own vehicles, and paid Medi-Wheels for required insurance and to reimburse the cost of required tools and safety equipment. Considering a similar outlay of expenses, the Eleventh Circuit explained that "these expenses detract little from the worker's economic dependence . . . which is the lens through which we evaluate each of the several factors." *Scantland*, 721 F.3d at 1317-18. The *Scantland* Court explains:

> Technicians are required to have vehicles, auto insurance, tools and safety equipment, and commercial general liability insurance. However, in light of the fact that most technicians will already own a vehicle suitable for the work and that many technicians purchased specialty tools from Knight directly via payroll withholdings, there seems to be little need for significant independent capital and very little difference from an employee's wages being increased in order to pay for tools and equipment. Furthermore, even though a technician who initially bought his tools from Knight and paid for them via withholdings has some economic independence when the tools are paid for, it is analogous to the independence any employee has who has gained experience and the ability to market himself to competing employers.

*Id.* Thus, as that Court held, this Court should find that this factor weighs in favor of independent contractor, but that its "weight in that direction is minimal." *Id.*

**(4) Medi-Wheels Did Not Require the Drivers to Have Special Skills. [See Material Facts 55-56].**

Driving does not require special skills or initiative. *Senvoy, LLC*, 2018 WL 3722210, at *9 (drivers only needed license, vehicle, and clean background check); *Gustafson v. Bell Atl. Corp.,* 171 F.Supp.2d 311, 326 (S.D.N.Y. 2001) (chauffeur's duties required no specialized skill or initiative); *Campos v. Zopounidis*, 2011 WL 2971298, at *7 (D. Conn. 2011) ("possession of a driver's license and the ability to drive an automobile is properly characterized as a 'routine life

skill'"). Work may be "difficult and demanding" without requiring special skills. *Harris v. Skokie Maid & Cleaning Serv., Ltd.*, 2013 WL 3506149, at *8 (N.D. Ill. 2013). Although specialized job skills support independent contractor status, "[s]kills are not the monopoly of independent contractors;" all jobs require some modicum of skill. *U.S. Dep't of Labor v. Lauritzen*, 835 F.2d 1529, 1537 (7th Cir. 1987). This element weighs in favor of employee status.

### (5) The Drivers Worked for Medi-Wheels on a Continuous and Indefinite Duration. [See Material Facts 11-12, 57-59].

Independent contractors "often have fixed employment periods and transfer from place to place as particular work is offered to them, whereas 'employees' usually work for only one employer and such relationship is continuous and indefinite in duration." *Keller v. Miri Microsystems, LLC*, 781 F.3d 799, 807 (6th Cir. 2015); *Superior Care*, 840 F.2d at 1060-61 (workers were employees even though 78% worked 13 weeks or less); *Robicheaux v. Radcliff Mat., Inc.*, 697 F.2d 662, 666 (5th Cir. 1983) (welders, whose tenure ranged from 10 months to three years, were employees). *Cf. Gate Guard Svcs. v. Solis*, 2013 WL 593418, at *10-11 (S.D. Tex. Feb. 13, 2013) (workers hired on project basis from one to several weeks were independent contractors). Courts consistently find contracts with automatic renewal clauses – like the IC Agreements between Defendant and Drivers - demonstrate permanence. *See, e.g., Solis v. Velocity Exp., Inc.*, 2010 WL 3259917, at *9 (D. Or. 2010) (indefinite, routinely renewed contracts favor employee status); *Senvoy*, 2018 WL 3722210 (factor met where agreements had one-year term renewing automatically and drivers worked 10 or more hours per day); *Usery v. Pilgrim Equip. Co.*, 527 F.2d 1308, 1314 (one-year contracts with routine renewals showed permanence).

Here, Drivers worked for Medi-Wheels for a continuous and indefinite duration, with an average tenure of 11 months and over 40 percent employed for one or more years during the Relevant Time Period. The Drivers were Defendant's regular workforce who provided daily transportation to numerous passengers—not independent contractors hired for a discrete task. For those Drivers with IC Agreements, their contracts' automatic renewal clauses further reinforce employee status.

**(6) Medical Transportation Drivers Were Integral to Medi-Wheels' Business. [See Material Facts 3, 60-61].**

The more integral services are to a business, the more likely an employment relationship exists. *See Velocity Express, LLC,* 250 F.Supp.3d at 492-93 (drivers were integral to ground-shipping provider); *Kansas City Transp. Grp*, 2012 WL 3753736, at *10 (drivers were integral to transportation company for the elderly and individuals with disabilities despite defendant's assertion it was a dispatch/leasing business); *Ansoumana v. Gristede's Op. Corp*., 255 F.Supp.2d 184, 195 (S.D.N.Y. 2003) (delivery drivers were integral to drugstore by affording customers convenience of home shopping). Here, Drivers' work was integral to Defendant's business. Medi-Wheels is a transportation service provider, and Drivers provided transportation services. Without drivers, Defendant's business would cease to exist.

Consideration of the foregoing factors, both individually and collectively, leads inexorably to the conclusion that Medi-Wheels' Drivers are employees for purposes of the FLSA, not independent contractors. When the Drivers made themselves available to work they were dependent on Medi-Wheels to provide it, and when they were working on assignment for Medi-Wheels they were employees of Medi-Wheels.

**2.      Defendant is subject to "enterprise coverage," as meant by § 3(r) of the Act, 29 U.S.C. § 203(r). [See Material Facts 1-6].**

In order to be eligible for back wages for unpaid FLSA minimum wage or overtime, an employee must be "covered" by the FLSA.  Although Defendant contests whether the Drivers are "employees" under the Act, Defendant concedes that it is a "covered enterprise" within the meaning of § 3(r) of the Act, 29 U.S.C. § 203(r), and is thus subject to "enterprise coverage." Therefore, the Drivers are covered by the Act to the extent they are "employees" of Defendant.

**3.    As a matter of law, Defendant violated §§ 6, 7, 11(c) and 15(a)(5) of the Act. [See Material Facts 62, 67-68].**

Under Section 7 of the Act, Defendant is required to compensate employees at one and a half times the normal rate of pay for all hours worked in excess of forty within a single work week. 29 U.S.C. § 207.  Defendant's own records establish that many of the Drivers regularly worked over 40 hours per week during the Relevant Time Period, and that Defendant paid these Drivers the same piece-rate per trip regardless of hours-worked.  Accordingly, once the Court finds that the Drivers are employees, it must find that Defendant has violated Section 7 as a matter of law.

Under Section 6 of the Act, Defendant is required to compensate employees at not less than federal minimum wage, $7.25 per hour. During certain weeks, the deductions Defendant took from the Drivers' earnings pushed their hourly rate below this threshold. The deductions Defendant took[2] were primarily for the benefit of Medi-Wheels and therefore cannot be counted towards the minimum wage. 29 C.F.R. § 531.36(b). Accordingly, once the Court finds that the Drivers are employees, it must find that Defendant has violated Section 6 as a matter of law.

Defendant also repeatedly violated the provisions of §§ 11(c) and 15(a)(5) of the Act, 29 U.S.C. §§ 211(c) and 215(a)(5), and Regulations found at 29 C.F.R. § 516, by failing to make,

---

[2] The deductions include (1) the flat weekly licensing fee which covered the commercial liability insurance Medi-Wheels required and paid Medi-Wheels' overhead (e.g., cost of dispatchers), (2) reimbursements for equipment required by Medi-Wheels (e.g., first aid kit, fire extinguisher, etc.), and (3) "late fees" charged by the Providers.

keep and preserve adequate and accurate records of the persons employed and of the wages, hours and other conditions and practices of employment maintained by them, as prescribed in the aforesaid Regulations.  Specifically, Defendant's records fail to accurately reflect that the Drivers are employees, not independent contractors.  It is uncontested that Medi-Wheels did not keep and maintain weekly records of hours worked by their Drivers. As a result, Defendant's pay records also failed to include total daily and weekly hours, regular rates, and overtime rates. This conduct clearly violates §§ 11(c) and 15(a)(5) of the Act, 29 U.S.C. §§ 211(c) and 215(a)(5), and the Regulations found at 29 C.F.R. § 516.

4.      **As a direct result of its violations of Sections 6, 7, 11(c) and 15(a)(5) of the Act, 29 U.S.C. § 201, *et seq.*, Defendant is liable for $384,589.46 in back wages for the period of time from June 20, 2020 through December 1, 2022. [See Material Facts 63-76].**

The Secretary's calculation of back wages owed is reasonable.  Defendant did not keep a record of hours-worked; however, the Transitrak application Defendant used to assign routes to Drivers and to track their work recorded the times of all pick-ups and drop-offs completed by the Drivers.  As described in detail in the Declaration of WHI Silwany, the Secretary reasonably used this data to reconstruct daily hours-worked, based on the first time each driver entered a work-event into the Transitrack application and the last entry for each day.  Based on a review of the records themselves – which show minimal time between drop off and the next pick up – and driver interviews, the Secretary reasonably considered all time between the first and last work-duty to be working time.  It is uncontested that Defendant did not build any meal break or other breaks into the routes assigned to the Drivers.  Where Defendants fail to keep and maintain appropriate records under the Act, the Secretary's reasonable calculations are entitled to deference absent contrary, specific evidence of the hours actually worked provided, for which

Defendant carries the burden.  *See Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 687–88 (1946), *superseded by statute on other grounds*, 29 U.S.C. § 254(a).

**5.      Defendant is liable for liquidated damages equal to back wages owed. [See Material Fact 78].**

An employee who prevails under the FLSA is entitled to liquidated damages equal to the unpaid wages. 29 U.S.C. § 216(b).  "These liquidated damages represent compensation, and not a penalty.  Double damages are the norm, single damages the exception." *Local 246 Util. Workers Union v. S. Cal. Edison Co.,* 83 F.3d 292, 297 (9th Cir. 1996).  ("Any employer who violates [the overtime provisions of the FLSA] shall be liable to the employee or employees affected in the amount of ... their unpaid overtime compensation ... and in an additional equal amount as liquidated damages.").  *See also Dybach v. State of Fla. Dep't of Corr.*, 942 F.2d 1562, 1566-67 (11th Cir. 1991).

The Eleventh Circuit considers liquidated damages to be mandatory absent a defendant's demonstration of good faith.  *See Ochoa v. Alie Bros.,* No. 6:06CV609ORL-DAB, 2007 WL 2781192, at *7 (M.D. Fla. Sept. 19, 2007) (citing cases).  "When the jury finds an employer has violated the overtime provision of the FLSA and assesses compensatory damages, the district court generally must add an award of liquidated damages in the same amount, which doubles the total damages awarded." *Alvarez Perez v. Sanford-Orlando Kennel Club, Inc.*, 515 F.3d 1150, 1163 (11th Cir. 2008) (citing 29 U.S.C. § 216(b) and *Dybach v. State of Fla. Dep't of Corr.*, 942 F.2d 1562, 1566–67 (11th Cir. 1991)).  However, if the employer can prove "'that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act,'" the court may use its discretion to reduce or deny the liquidated damages.  *Alvarez Perez*, 515 F.3d at 1163 (quoting 29 U.S.C. § 260).

The employer bears the burden of establishing both the subjective and objective components of that good faith defense against liquidated damages. *Dybach,* 942 F.2d at 1566; *Spires v. Ben Hill County,* 980 F.2d 683, 689 (11th Cir. 1993). Subjective good faith means the employer has an honest intention to ascertain what the FLSA requires and to act in accordance with it. *Dybach v. Fla. Dep't of Corr.*, 942 F.2d 1562, 1566 (11th Cir. 1991). Objective good faith means the employer had reasonable grounds for believing its conduct comported with the FLSA. *Id.* "[G]ood faith requires some duty to investigate potential liability under FLSA." *Barcellona v. Tiffany English Pub, Inc.*, 597 F.2d 464, 469 (5th Cir. 1979). If an employer fails to show that it has met both the subjective and objective components of the good faith analysis, "the court is given no discretion by the statute, and it continues to be the duty of the court to award liquidated damages." 29 C.F.R. § 790.22(b).

The undisputed facts establish that Defendant cannot meet its burden of proving subjective good faith and reasonable grounds for believing its conduct was in compliance with the FLSA. Defendant took **no active steps** to ascertain its compliance with the FLSA. It did not seek an expert opinion or even refer to published Wage and Hour guidance on whether the Drivers were properly classified as independent contractors and thus exempt from the FLSA. Such failure to ascertain their obligations under the FLSA is contrary to a good faith defense to liquidated damages. *See Gustafson v. Bell Atl. Corp.*, 171 F. Supp. 2d 311, 326–27 (S.D.N.Y. 2001) (finding that employer failed to demonstrate good faith defense to liquidated damages where it took no active steps to ascertain its compliance with the FLSA such as seeking an expert or outside opinion on the whether its contract drivers were exempt); *see also Ochoa v. Alie Bros.*, No. 6:06-CV-609-ORL-DAB, 2007 WL 2781192, at *7 (M.D. Fla. Sept. 19, 2007) (awarding

16

liquidated damages for overtime violations of the FLSA where defendants failed to research the overtime provisions of the law before hiring employees).

Considering the foregoing evidence in the light most favorable to Defendant, Defendant cannot establish that it had both a subjective and objective good faith belief that it was compliant with the FLSA and thus cannot show a reduction or denial of liquidated damages is warranted. Accordingly, judgment against Defendant in the full amount of back wages owed and an equal amount of liquidated damages is appropriate as a matter of law.

> **6.      The Secretary's requested injunctive relief is appropriate as a matter of law.**

For cause shown, the district courts have jurisdiction, pursuant to 29 U.S.C. § 217, to "restrain violations" of the Act.  *Id.*  Because the fact of these violations is not in dispute, as a matter of law, the Secretary is entitled, pursuant to § 217 of the Act, to an injunction permanently enjoining Defendant, its agents, servants, employees and all persons in active concert or participation with them from violating the provisions of §§ 6, 7, 11(c), and 15(a)(5) of the Act.

> **7.      As a matter of law, Defendant's asserted affirmative defenses cannot succeed.**

In their Answer, Defendant raises seven "Defenses and Affirmative Defenses."  The first asserted defense – that the Drivers are independent contractors [ECF No.18/Answer, p. 3. ¶ 1] – must fail for the reasons stated *supra*.  The Secretary addresses the remaining defenses below.

> ### (2) "Taxicab Exemption"

In its second asserted defense, Defendant claims that Medi-Wheels is "in the business of operating taxicabs" and, therefore, its Drivers are exempt from the FLSA's overtime payment requirement under the "taxicab exemption" described at 29 U.S.C. § 213(b)(17). [ECF No. 18/Answer, p. 3, ¶ 2]. The determination of whether a given employee falls within the scope of an FLSA exemption, while based on the underlying facts, is ultimately a legal question. *Viart v.*

*Bull Motors, Inc.,* 149 F.Supp.2d 1346, 1349 (S.D. Fla 2001). The employer has the burden of showing that it is entitled to the exemption by a preponderance of the evidence. *Dybach v. State of Fla. Dept. Of Corrections,* 942 F.2d 1562, 1566 n. 5 (11th Cir.1991).  Since the FLSA's enactment, its exemptions have been narrowly construed against the employers. *See Mitchell v. Ky. Fin. Co.,* 359 U.S. 290, 295 (1959). However, the Supreme Court recently reversed this rule because the FLSA gives no "textual indication" that its exemptions should be narrowly construed. *Encino Motorcars, LLC v. Navarro,* 138 S.Ct. 1134, 1142 (2018). Now, instead of a narrow construction, the exemptions must be given a "fair reading." *Id.*; s*ee Hogan v. Allstate Ins. Co.,* 361 F.3d 621, 625 (11th Cir. 2004).

As set forth below, the undisputed facts supported by the record evidence preclude the application of this exemption as a matter of law. Neither the FLSA nor the Code of Federal Regulations defines the phrase "the business of operating taxicabs." The Eleventh Circuit, noting that the Department of Labor's field operations handbook was not entitled to deference but could be persuasive, turned to the handbook's description of taxicab operation:

> "'*Business of operating taxicabs.*' The taxicab business consists normally of common carrier transportation in small motor vehicles of persons and such property as they may carry with them to any requested destination in the community. The business operates without fixed routes or contracts for recurrent transportation. It serves the miscellaneous and predominantly local transportation needs of the community. It may include such occasional and unscheduled trips to and from transportation terminals as the individual passengers may request, and may include stands at the transportation terminals as well as at other places where numerous demands for taxicab transportation may be expected."

*Abel v. Southern Shuttle Services, Inc.*, 301 Fed.Appx. 856, 859 (11th Cir. 2008) (unpublished op.) (quoting Dept. of Labor, WHD, Field Operations Handbook § 24h01); *Reynolds v. Pronto Corp.*, 2009 WL 10667071 (S.D. Fla. July 10, 2009) (holding that limousine drivers were not exempt "taxicab drivers").

In *Abel*, the Eleventh Circuit noted that an airport shuttle is not included in the plain meaning of the word "taxicabs," and that the defendant business did not refer to itself as a taxicab operator or to its vehicles as taxicabs. 301 Fed.Appx. at 859. The Court further reasoned that, unlike the hired vehicles commonly referred to as taxicabs, the vans used as airport shuttles could carry nine or ten passengers each, and that either the start or the end of a trip on the shuttle was always an airport. *Id.* at 859-60. Finally, the Court observed that the airport shuttle operator did not demonstrate that it had complied with the relevant municipal regulations applicable to taxicab operators, and that its shuttle vans were not equipped with taximeters. *Id.* at 860-61. Thus the Court found that the plain language of the exemption did not include the airport shuttle operator. *Id.* at 861. Conducting a similar analysis, courts in this district have refused to extend the taxicab exemption to limousine services. *See Powell v. Carey Int'l, Inc.*, 483 F. Supp. 2d 1168, 1178-79 (S. D. Fla. 2007); *Rossi v. Associated Limousine Services, Inc.*, 438 F. Supp. 2d 1354, 1363-64 (S. D. Fla. 2006).

Under the plain and fair meaning of 29 U.S.C. 213(b)(17), Defendant was not in the business of operating taxicabs; it was in the business of providing non-emergency medical transport services. *See Pioneer Inv. Serv. Co. v. Brunswick Assocs. Ltd. Partnership,* 507 U.S. 380, 388, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993) (stating that courts properly assume, absent sufficient indication to the contrary, that Congress intends the words in its enactments to carry "their ordinary, contemporary, common meaning"); *Anderson v. Cagle's Inc.,* 488 F.3d 945, 955 (11th Cir. 2007) (noting that when interpreting an FLSA exemption, a court must look to the plain language of the statute itself and give words of the statute "their ordinary, contemporary, common meaning").   The Drivers drove only on assignment from Medi-Wheels and did not pick up members of the general public. The inapplicability of the taxicab exemption to this Defendant

is consistent with *Abel, Rossi, Powell* and other decisions which have addressed this issue under circumstances where the vehicles are more similar to "taxicabs" than in the case at bar. *See Reynolds v. Pronto Corp.,* 2009 WL 10667071 (S.D. Fla. July 10, 2009) (finding that, despite their similarities to taxicab drivers, the drivers providing "transportation services for the disabled" were not exempt because they did not offer vehicles "for hire to the general public on city streets"); *Wirtz v. Cincinnati, Newport and Covington Transp. Co.,* 375 F.2d 513 (6th Cir. 1967) (finding that "red top" sedans which were not metered, did not have vacancy signs and which were not advertised as taxicabs did not fall under the taxicab exemption); *Herman v. Brewah Cab. Inc.,* 992 F.Supp. 1054 (E.D. Wis. 1998) (taxicab exemption did not apply to a transportation service for the elderly and handicapped); *Airlines Transp. v. Tobin,* 198 F.2d 249 (4th Cir. 1952) (holding that airport limousine company was not entitled to the benefit of the taxicab exemption). *See also Op. Letter, WHD of the U.S. DOL,* 1998 WL 852774, at *1 (April 17, 1998) ("While your client's vehicles might be involved in a number of activities associated with taxicab operations, we believe that, overall, your client's vehicles do not service the same transportation needs as taxicabs. The ordinary meaning of that term contemplates vehicles that are offered for hire to the general public on city streets. While it is not necessary that all the transportation be provided to persons who 'flag down' the vehicles, that is an important aspect of the common meaning of 'taxicab which your client's vehicles do not possess."). For this reason, Defendant cannot succeed on this affirmative defense.

**(3)-(6) Allegedly Non-Compensable Time: Breaks, *de minimus* time, and pre- and post-work time.**

In its asserted defenses three through six, Defendant challenges the Acting Secretary's computation of hours-worked, asserting that it is not liable for certain hours-works because it "did not know or have reason to know that the drivers at issue were working," and that the

Acting Secretary's back wages wrongly include "preliminary or postliminary activities", "meal periods," and "*de minimis*" working time.  In response to the Acting Secretary's Interrogatories, Defendant explains that it has no evidence specifically supporting these challenges, apart from the Transitrak data the Secretary relied upon in reasonably computing hours-worked. [Response to ROG 10 and 12].

Where Defendant fails to keep and maintain appropriate records under the Act, the Secretary's reasonable calculations are entitled to deference absent contrary, specific evidence of the hours actually worked provided, for which Defendant carries the burden.  *See Mt. Clemens Pottery Co.,* 328 U.S. at 687–88.  Even assuming Defendant has articulated a valid defense, it cannot meet its burden because the only documentary evidence reflecting the work performed by the Drivers shows that Medi-Wheels assigned back-to-back trips with minimal "downtime" between trips. Indeed, because Medi-Wheels required the Drivers to travel between each drop off and the next pick up in the time between trips, such time between trips spent traveling to the next trip is compensable time under the FLSA.

### (7) Statute of Limitations Defense

In its Amended Interrogatory Responses, Defendant concedes that its seventh defense based on the statute of limitations is without merit. (Response to ROG 12; Silwany Ex. D).

### V.   CONCLUSION

The Secretary moves for entry of a Summary Judgment and asks the Court to **ORDER** Defendant to refrain from withholding all back wages and liquidated damages due and owing to 59 employees under the Act, in the total amount of **$769,178.92,** and to permanently enjoin Defendant, its agents, servants, employees and all persons in active concert or participation with them from violating the provisions of §§ 6, 7, 11(c) and 15(a)(5) of the Act.  In the alternative,

the Secretary moves for entry of Judgment as to any or all of the seven individual issues listed in

the Introduction.


ADDRESSES:

Office of the Solicitor
U. S. Department of Labor
61 Forsyth Street, S.W.
Room 7T10
Atlanta, GA  30303
(404) 302-5435
(404) 302-5438 (FAX)

**Office of the Solicitor**
**U. S. Department of Labor**

SEEMA NANDA
Solicitor of Labor

TREMELLE I. HOWARD
Regional Solicitor

KRISTIN R. MURPHY
Acting Counsel

By: *s/ Lydia J. Chastain*
    LYDIA J. CHASTAIN
    Senior Trial Attorneys


**Attorneys for Plaintiff.**

## CERTIFICATE OF SERVICE

I certify that on February 5, 2024, the foregoing Plaintiff's Motion for Summary Judgment Against Defendant Medi-Wheels of the Palm Beaches, Inc. and Supporting Memorandum of Law was filed using the CM/ECF system and served on Defendant's counsel of record as follows:

Richard D. Tuschman, Esq.
Richard D. Tuschman, P.A.
rtuschman@gtemploymentlawyers.com

Mark J. Beutler, Esq.
Law Offices of Mark J. Beutler, P.A.
mjb@mjbpa.com

*/s/ Lydia J. Chastain*
LYDIA J. CHASTAIN
Senior Trial Attorney

SOL Case No. 22-00245