**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Palm Beach Division**

JULIE A. SU,
Acting Secretary of Labor,
United States Department of Labor,

      Plaintiff,

vs.

MEDI-WHEELS OF THE PALM
BEACHES, INC.,

      Defendant.
_____/

Case No. 9:23-cv-80505-RLR

**DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT WITH INCORPORATED MEMORANDUM OF LAW**

Defendant, MEDI-WHEELS OF THE PALM BEACHES, INC. ("Medi-Wheels" or "Defendant"), through its undersigned counsel, pursuant to Fed. R. Civ. P. 56 and Local Rules 7.1 and 56.1, hereby files this Response in Opposition to Plaintiff's Motion for Summary Judgment [D.E. 27].

### I. INTRODUCTION

Numerous disputed issues of material fact in this case preclude the entry of summary judgment in the Secretary's favor. The disputed issues are reflected in Defendant's Response to Plaintiff's Statement of Material Facts, which has been filed concurrently herewith. The disputed issues are also summarized in this Response. In particular, Defendant demonstrates that disputed issues of material fact exist under the six-factor "economic reality" test for determining employee versus independent contractor status. On the most important factor – the putative employer's control over the means and manner of the worker's performance – the disputed issues are numerous and significant. Contrary to the evidence submitted by the Secretary, Defendant's evidence shows that the drivers had significant freedom to control whom they worked for, when they worked, where they worked, and how they worked. Such freedoms are consistent with an independent contractor status and not typical of an employment relationship.

Disputed issues of material fact also exist with respect to the Secretary's calculation of damages. Defendant's evidence establishes that the Secretary's calculations are unreasonable, as they do not take into account periods of time in which the drivers took long breaks and meal periods. Such periods of time are not compensable under the FLSA pursuant to Department of Labor regulations and controlling case law and cannot be used to support a calculation of overtime. Accordingly, and for the reasons explained below, the Secretary's Motion for Summary Judgment should be denied.

## II.    RESPONSE TO THE SECRETARY'S STATEMENT OF RELEVANT LEGAL AUTHORITIES

Defendant does not take issue with the Secretary's recitation of the legal standard for summary judgment or of her description of the FLSA. However, it must be noted that the FLSA's overtime and minimum wage standards do not apply to workers properly classified as independent contractors. *Scantland v. Jeffry Knight, Inc.*, 721 F.3d 1308, 1311 (11th Cir. 2013).

## III.    RESPONSE TO THE SECRETARY'S ANALYSIS

**1. Disputed Issues of Material Fact Exist on the Issue of Whether the Drivers are Employees or Independent Contractors.**

Defendant agrees with the Secretary that, in accordance with Eleventh Circuit precedent, the "economic reality" of the drivers' relationship with Defendant determines whether the drivers should be deemed employees or independent contractors. *See Scantland, Inc.*, 721 F.3d at 1311-12. Courts follow a six-factor test and should "view the subsidiary facts relevant to each factor through the lens of 'economic dependence' and whether they are more analogous to the 'usual path' of an employee or an independent contractor." *Scantland*, 721 F.3d at 1312.

However, the Eleventh Circuit has also stressed that "these six factors are not exclusive and no single factor is dominant." *Id.* "The weight of each factor depends on the light it sheds on the putative employee's dependence on the alleged employer, which in turn depends on the facts of the case.'" *Scantland*, 721 F.3d at 1312 n.2 (quoting with approval *Santelices v. Cable Wiring*, 147 F. Supp. 2d 1313, 1319 (S.D. Fla. 2001)). "'While these factors serve as guides, the overarching focus of the inquiry is economic dependence" —that is, "on whether an individual is 'in business for himself' or is 'dependent upon finding employment in the business of others.'" *Scantland*, 721 F.3d at 1312 (quoting *Mednick v. Albert Enters., Inc.*, 508 F.2d 297, 301-02 (5th Cir. 1975)). *See also Diego v. Victory Lab, Inc.*, 282 F. Supp. 3d 1275, 1284 (S.D.

Fla. 2017) (holding that "although four of the six factors favor employee status, the two remaining factors strongly outweigh the others when analyzing economic dependence.").

Viewed in the light most favorable to the non-movant Defendant, the evidence reveals significant disputed issues of material fact under the six-factor test that preclude the entry of summary judgment in the Secretary's favor.

**(1) Control**

Under the economic reality test, the putative employer's control over the means and manner of the worker's performance is the most important factor. *Spears v. Choctaw Cty. Comm'n*, No. 07-0275-CG-M, 2009 US. Dist. LEXIS 66037, at *20 n.4 (S.D. Ala. July 30, 2009) (quoting Eleventh Circuit Pattern Jury Instructions, (Civil Cases), 1.10.4.2).

As explained below, the drivers in this case had significant freedom to control whom they worked for, when they worked, where they worked, and how they worked. Such freedoms are consistent with an independent contractor status and not the "usual path" of an employee. Additionally, although the drivers were subject to various rules, most of these rules were imposed by Defendant's clients, the insurance companies that provided the work ("Providers") and were not actively enforced by Defendant.

During the relevant period, drivers could and did drive for other companies such as Uber, Lyft, and Door Dash. [Sabata Dec. ¶ 1; Rengifo Dec. ¶ 1; Fuller Dec. ¶ 1; Tocci 18:1-6; 137:1-11; 139:3-4] This is a significant indicator of independent contractor status. *See e.g., Galarza v. One Call Claims, LLC*, No. 1:21-00250-N, 2023 U.S. Dist. LEXIS 152211, at *22 (S.D. Ala. Aug. 29, 2023) (independent contractor status favored where plaintiffs had an opportunity to work for other companies at the same time they worked for the defendants); *Beard v. Langham*, 649 F. Supp. 2d 1332, 1340 (S.D. Ala. 2009) (fact that individuals who hauled logs for defendant owned their own trucks and worked not only for defendant but also for other logging companies supported independent contractor status).[1]

Drivers were also free to perform "personals," i.e., transportation for clients who called the drivers directly. [Tocci 62:15-63:11; 138:25-139:1] In fact, some drivers had their own business cards which had their own company name on them. [Tocci 68:6-10; 138:4-8] For

---

[1] *See also Saleem v. Corp. Transp. Group, Ltd.*, 854 F.3d 131, 141 (2d Cir. 2017) (fact that drivers could and did work for competing companies indicates company's lack of control over its workers and indicates independent contractor status); *Herman v. Express Sixty-Minutes Delivery Serv., Inc.*, 161 F.3d 299, 305 (5th Cir. 1998) (same).

example, David Winfrey had his own business cards, which he handed out to customers and prospective customers. [Winfrey Dec. ¶ 4] Winfrey received about 30% of his work from Medi-Wheels; the rest came from other sources, including word of mouth and the car line at the airport. [Winfrey Dec. ¶ 4] Winfrey also had one or two drivers who worked for him and drove for Medi-Wheels. [Tocci 64:21-24]

Drivers had input as to when and where they wanted to work, and Medi-Wheels assigned trips to drivers based on these parameters. [Tocci 80:17-81:6; D. Suazo 56:21-57:3] Drivers set their own schedules. [Sabata Dec. ¶ 4; Winfrey Dec. ¶ 5; Rengifo Dec. ¶ 3; Longobardi Dec. ¶ 3; Fuller Dec. ¶ 2; Tackett Dec. ¶ 3] They received assignments from Medi-Wheels via the Transitrak application (dispatch software) but fit the assignments into their schedules. [Sabata Dec. ¶ 4; Winfrey Dec. ¶ 5; Rengifo Dec. ¶ 3; Longobardi Dec. ¶ 3; Fuller Dec. ¶ 2; Tackett Dec. ¶ 3; Tocci 78:12-18] *See Nieman v. National Claims Adjusters, Inc.*, 775 F. App'x 622 (11th Cir. 2019) (control factor weighed in favor of independent contractor status for the plaintiff insurance adjuster where plaintiff controlled the geographic location within which he took assignments, and controlled when he started work for defendant and for how long and how many assignments he took from defendant. "In other words, he controlled his schedule.").[2] Drivers were free to decline assignments from Medi-Wheels. [Sabata Dec. ¶ 4; Winfrey Dec. ¶ 5; Rengifo Dec. ¶ 3; Longobardi Dec. ¶ 3; Fuller Dec. ¶ 2; Tackett Dec. ¶ 3.; Tocci 78:19-23; 80:11-16] Drivers were also able to and frequently did call Medi-Wheels' dispatchers to change their assignments. [Tocci 82:19-23; 106:12] Drivers declined assignments based on the price of the fare, the geographic area of the trip, a conflict in their schedule, or for other reasons. [Tocci 106:15-107:5; 109:2-12] For example, when Amy Sabata hurt her back and could not assist patients with wheelchairs or walkers, she declined these assignments. [Sabata Dec. ¶ 4]

During the day, if the drivers had downtime, they could go home and take a nap or do chores. [Sabata Dec. ¶ 4] For example, a dialysis appointment takes about four hours. If a driver was scheduled to do a round trip, the driver could do whatever he wanted after dropping off the patient at the appointment before picking up the patient at the end of the appointment. [Tocci

---

[2] *See also Walsh v. Alpha & Omega USA, Inc.*, 39 F.4th 1078, 1084 (8th Cir. 2022) (drivers' abilities to set their own schedules during working hours demonstrate a lack of control for purposes of independent contractor analysis under the FLSA); *Saleem v. Corp. Transp. Group, Ltd.*, 854 F.3d 131, 146 (2d Cir. 2017) (the fact that plaintiff set their own schedules weighed in favor of independent contractor status); *Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 171 (2d Cir. 1998) (similar).

98:5-19] Drivers were also free to take breaks and meals between trips. [Tocci 104:17-25; Tocci Dec. ¶ 11] Indeed, even when there were not more than 30 minutes between scheduled trips, drivers often took 30 minutes or more to eat, and would arrive late to the next scheduled trip. Drivers were typically not penalized for being late. [Tocci Dec. ¶ 11]

Medi-Wheels did not guarantee any particular volume of work. [Sabata Dec. ¶ 4; Tocci 81:18-24; 90:6-91:2] If Medi-Wheels had work for the drivers, it was the drivers' decision how much to work. [Sabata Dec. ¶ 4; Winfrey Dec. ¶ 5; Rengifo Dec. ¶¶ 3 and 6; Longobardi Dec. ¶ 3; Fuller Dec. ¶ 2; Tackett Dec. ¶ 3; Tocci 116:5-9] Drivers were not required to obtain permission from Medi-Wheels before taking time off for vacation or other personal reasons. [Sabata Dec. ¶ 5; Winfrey Dec. ¶ 7; Longobardi Dec. ¶ 3; Fuller Dec. ¶ 2; Tackett Dec. ¶ 3] For example, Amy Sabata frequently travelled out of town on short vacations, so she simply notified Medi-Wheels before taking time off. [Sabata Dec. ¶ 5] Similarly, Robert Tackett told Medi-Wheels' dispatcher Mike Stone he was going to take a month off. Stone said, "Okay, let me know when you're ready to come back." [Tackett Dec. ¶ 3] Tackett also decided at some point for personal reasons not to work a full day. [Tackett Dec. ¶ 3; Tocci 116:10-19]. *See, e.g., Saleem v. Corp. Transp. Group, Ltd.*, 52 F. Supp. 3d 526, 537 (S.D.N.Y. 2014) ("Particularly relevant to the control factor is whether a worker is 'free to set his own schedule and take vacations when he wished'") (quoting *Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149, 171 (2d Cir. 1998)); *Walsh v. Alpha & Omega USA, Inc.*, 39 F.4th 1078, 1084 (8th Cir. 2022) (drivers' abilities to set their own schedules during working hours demonstrate a lack of company control for purposes of FLSA independent contractor analysis).

The foregoing facts are much different than the facts in *Scantland*, in which the Eleventh Circuit found that the control factor pointed strongly toward employee status. *See Scantland*, 721 F.3d at 131-16. In *Scantland*, the plaintiffs were required to report to a facility by 7:00 to 7:15 each morning; could not reject a route or a work order within their route without threat of termination or being refused work in the following days; were required to attend quality control meetings and classes on new equipment or participate in a monthly equipment inventory; could be required to assist other technicians or be assigned additional jobs that they could not refuse; might be required to stay on the job until all the technicians in their area had completed their work; could be called back to jobs long after completing them to address problems; could not work for other companies; were subject to "remedial training" if there were consistent quality control issues; were required to work six days a week and sometimes seven days a week because

5

of a requirement that they work rotating Sundays; and either had to inform their supervisors that they would be taking time off or request time off in advance, sometimes in writing. *Id*. at 1313-16. *None* of the foregoing indicia of control by the putative employer exist in the instant case.

Rather, for the drivers at issue in this case, i.e., those who performed non-emergency medical transportation, Defendant's business model mimicked the Yellow Cab model under which the majority of the drivers that Medi-Wheels hired had worked in the past. [Tocci 17:22-25; 19:9-20:1; 41:12-42:5] In fact, Yellow Cab had similar contracts with insurance providers ("Providers") such as LogistiCare, MTM, and Access2Care to provide non-emergency medical transportation. [Tocci 21:20-23] Under a taxicab model, the company's supervision over the drivers is minimal and relates mainly to assigning the work and ensuring compliance with basic quality control and safety standards. Such a model is consistent with an independent contractor, not an employment, relationship. *See Hart v. Rick's Cabaret Intern., Inc.*, 967 F. Supp. 2d 901, 916 (S.D.N.Y. 2013) (company rules imposed to assure compliance with extant law, or rules aimed at the safety of customers or the workers themselves, did not evidence company control over workers); *Diego v. Victory Lab, Inc*., 282 F. Supp. 3d 1275, 1282 (S.D. Fla. 2017) (control factor favored independent contractor finding where alleged employer was not "overly active" in overseeing the work but, rather, it simply provided minimal guidance to support the work and collect data).

The instant case is closer to the Eleventh Circuit's decision in *Freund v. Hi-Tech Satellite, Inc.*, 185 F. App'x 782, 784 (11th Cir. 2006). In *Freund*, the district court determined, after a bench trial, that Freund, an installer of home satellite and entertainment systems, was not entitled to overtime pay from the defendant ("Hi-Tech") because he was an independent contractor, not an employee. *Id*. at 782. The Eleventh Circuit affirmed. *Id*. at 785. On the issue of control, the district court determined that Hi-Tech exerted very little control over Freund, where, *inter alia*, Hi-Tech scheduled the installation appointments but Freund could re-schedule them; the details about how Freund carried out his duties were left to him except that he could not perform any additional services that were not paid for by the customers without Hi-Tech's approval; he had to wear a Hi-Tech shirt during appointments; he had to follow certain minimum specifications for the installations; he had to call Hi-Tech to confirm he had completed the installation and report any problems that had arisen; and he was free to perform installations for other companies and could have established his own subcontracting corporation. *Id*. at 783. As noted by the Eleventh Circuit, "[t]he district court found that Hi-Tech's interest in Freund's work

was the end result of customer satisfaction, and not with the day-to-day regulation of his work habits, hours worked or work methods." *Id*. Given the evidence in this case, the same can be said of Medi-Wheels' interest in the drivers' work.

Notably, the Eleventh Circuit in *Freund* cited approvingly to the Fourth Circuit Court of Appeals' decision in *Chao v. Mid-Atlantic Installation Servs.*, 16 F. App'x 104 (4th Cir. 2001). *See Freund* 185 F. App'x at 784. In *Chao*, Comcast contracted with M/A Telecommunications, Inc. ("MAT") to install cable; MAT, in turn, contracted with individual installers to perform the installation and repair work. *Id*. at 105. Similar to the arguments advanced by the Secretary in the instant case, the Secretary argued that MAT's practice of ensuring compliance with various local regulations or with the client's (Comcast's) technical specifications, and penalizing the installers for failing to do so, demonstrated the type of control characteristic of an employment relationship. *Id*. at 105. The Fourth Circuit disagreed and affirmed the district court's conclusion that "requiring the Installers to meet MAT's and Comcast's installation specifications is entirely consistent with the standard role of a contractor who is hired to perform highly technical duties." *Id*. (citing *See Dole v. Amerilink Corp.*, 729 F. Supp. 73, 76 (E.D. Mo. 1990) (explaining that specifications and quality control "inhere[] in any subcontractor relationship"). *See also Hargrave v. AIM Directional Servs., L.L.C.*, No. 21-40496, 2022 U.S. App. LEXIS 12721, 2022 WL 1487020, at *3 (5th Cir. May 11, 2022) (per curiam) (unpublished) (noting that encouraging workers to wear a hard-hat with a company logo and mandating compliance with safety policies and procedures that are generally required for safe operations on an oil-drilling site is "not the type of control that counsels in favor of employee status.").

As in *Chao*, Medi-Wheels' clients imposed various rules and requirements in their contracts relating to safety and quality control. For, example, the Providers required the drivers to submit to drug testing and a medical examination. [Tocci 35:18-20] The Providers also established certain rules for hiring drivers. For example, the Providers required that Medi-Wheels not use any drivers who were convicted of three or more minor motor vehicle moving violations within the previous 24 months. [Tocci 35:23-36:2] The Providers also imposed certain rules, such as not using the cell phone will driving, and no eating, drinking, or smoking in the vehicle. [Sabata Dec. ¶ 3; Fuller Dec. ¶ 5] These rules were set by the Providers, not by Medi-Wheels. [Sabata Dec. ¶ 3; Fuller Dec. ¶ 5]. *See Thomas v. TXX Servs., Inc.*, 663 Fed. App'x. 86, 89 (2d Cir. 2016) (The company's requirements imposed on workers were dictated by the nature of its business or were imposed by the customers rather than the company itself, and thus did not

7

support proposition that the company controlled workers for purposes of FLSA); *Fernandez v. Kinray, Inc.*, 406 F. Supp. 3d 256, 264 (E.D.N.Y. 2018) (same).

Significantly, however, Medi-Wheels did not actively enforce compliance with these rules; only if a complaint was received would Medi-Wheels remind the driver of the obligations of the Provider's contract. [Tocci 28:6-16] Medi-Wheels did not itself provide the drivers with a handbook or a list of rules or procedures they had to follow. [Tocci 28:17-21; 54:19-24] Medi-Wheels did not survey passengers to gauge their satisfaction with the drivers' services. [Tocci 29:10-13] Nor did Medi-Wheels perform spot checks of drivers to ensure that the drivers were following the Providers' rules. [Tocci 29:4-7] The fact that Medi-Wheels *could* have enforced the Providers' rules is irrelevant under the economic reality test. *See Scantland*, 731 F.3d at 1311-12 ("[T]he economic realities are reflected by the way one actually acts," not "how one could have acted under the contract terms.") (quoting *Usery v. Pilgrim Equip. Co.*, 527 F.2d 1308, 1312 (5th Cir. 1976)); *Broome v. CRST Malone*, Inc., No. 2:19-cv-01917-MHH, 2021 U.S. Dist. LEXIS 261153, at *28 (N.D. Ala. Sep. 24, 2021) (same).

Indeed, some drivers openly flouted the Providers' rules, and Medi-Wheels still chose not to enforce them. For example, the Providers' contracts required that the drivers wear a Medi-Wheels shirt, but Medi-Wheels did not enforce this rule. [Tocci 69:13-25] Several drivers did not wear Medi-Wheels shirts or believed that it was not a requirement. [Sabata Dec. ¶ 5; Rengifo Dec. ¶ 5; Longobardi Dec. ¶ 5; Fuller Dec. ¶ 5; Tackett Dec. ¶ 5] Similarly, the drivers also were given magnetic Medi-Wheels signs for their cars, but many drivers did not use them, and Medi-Wheels did not pressure them to do so. [Tackett Dec. ¶ 5; Winfrey Dec. ¶ 6; Tocci 70:1-15] Moreover, as noted above, drivers were typically not penalized for being late to an assigned trip. [Tocci Dec. ¶ 11]

In sum, on the most significant issue in this case – the degree of control exercised over the workers by the putative employer – there is substantial evidence that the drivers had a significant amount of freedom to control whom they worked for, when they worked, where they worked, and how they worked. Such freedoms are consistent with an independent contractor status and not the "usual path" of an employee.

**(2) Opportunity for Profits or Loss Depending on Managerial Skill**

Aside from about four wheelchair-compatible vehicles that Medi-Wheels purchased, the drivers used their own personal vehicles to perform their job. [Tocci 32:4-25] Drivers decided what vehicles to purchase, how to maintain their vehicles, and whether to repair or replace them,

buy new tires, etc. [Sabata Dec. ¶ 2; Rengifo Dec. ¶ 2; Longobardi Dec. ¶ 2; Fuller Dec. ¶ 3; Tackett Dec. ¶ 2; D. Suazo 29:20-30:16; J. Suazo 53:25-54:5]

For example, Amy Sabata decided to buy a used 2017 Dodge Grand Caravan for $14,000. [Sabata Dec. ¶ 2] In 2022, Sabata decided to replace the vehicle's transmission, which cost her about $3,500-$4,000, rather than buying a new vehicle. [Sabata Dec. ¶ 2] Michael Longobardi made the decision to have the oil changed on his vehicle every 5,000 miles with fully synthetic oil. [Longobardi Dec. ¶ 2] Drivers also decided where to buy fuel for their vehicles. [D. Suazo 28:22-29:3] Such decisions affected the profitability of the drivers' businesses. [Sabata Dec. ¶ 2; Rengifo Dec. ¶ 2; Longobardi Dec. ¶ 2; Fuller Dec. ¶ 3; Tackett Dec. ¶ 2] *See Thibault v. Bellsouth Telecommunications, Inc.*, 612 F.3d 843, 848 (5th Cir. 2010) (noting that a worker's ability to "[i]ncrease profits by controlling costs" is an exercise of "managerial skill" indicative of an independent contractor.)

To the extent that the drivers were subject to penalties if they were late or caused a rider to miss an assigned appointment, the drivers' ability to avoid such penalties was an indication of their skill in managing their schedules. *See Chao*, 16 F. App'x 104 106-07 (installer's net profit or loss depended, *inter alia*, on his skill in meeting technical specifications, thereby avoiding back charges, and on the business acumen with which the installer makes his required capital investments in tools, equipment, and a truck).

It is true, as the Secretary points out, that the drivers' opportunity for profit or loss was constrained by the fact that Medi-Wheels assigned the trips to the drivers (when they were working for Medi-Wheels and not themselves or another company), and by the fact that the drivers' pay was based on pre-determined trip rates negotiated between Medi-Wheels and the Providers. But such constraints exist for all workers, whether they are employees or independent contractors. As noted by the court in *Chao* in affirming the district court's conclusion that the Installers had an "opportunity for profit or loss" that was indicative of independent contractor status, even independent contractors are constrained by market forces:

> The district court recognized that the Installers are not *solely* in control of their profits or losses, since they cannot unilaterally determine how many Comcast customers they will service on a given day or the rate at which they are paid for each job. Yet the court concluded that the Installers are no less in control of their net profits as a result of these variables than typical independent contractors, "whose income [also] derives from how much work someone else wants to give them and at what rate they will be paid."

16 Fed. App'x at 107 (emphasis in original).

In sum, there is significant evidence that the drivers' opportunity for profit and loss depended on their managerial skill. The constraints on their opportunity for profit and loss exist for all workers and were not inconsistent with their independent contractor status.

### (3) Investment in Equipment or Materials

As noted above, aside from about four wheelchair-compatible vehicles that Medi-Wheels purchased, the drivers used their own personal vehicles to perform their job. [Tocci 32:4-25] Medi-Wheels did not cover any of the expenses associated with the drivers' vehicles or business. [Sabata Dec. ¶ 3; Rengifo Dec. ¶ 4; Longobardi Dec. ¶ 4; Fuller Dec. ¶ 4; Tackett Dec. ¶ 5] Drivers decided what vehicles to purchase, how to maintain their vehicles, and whether to repair or replace them, buy new tires, etc. [Sabata Dec. ¶ 2; Rengifo Dec. ¶ 2; Longobardi Dec. ¶ 2; Fuller Dec. ¶ 3; Tackett Dec. ¶ 2; D. Suazo 29:20-30:16; J. Suazo 53:25-54:5] Drivers had to pay for a DOT physical every two years and for online training, which were requirements of the Providers' contracts. [Sabata Dec. ¶ 3; Tocci 43:12-24] The drivers also purchased first-aid kits, a fire extinguisher, and other safety-related items. [Tocci 71:18-72:9; D. Suazo 34:23-35:9] These items were offered by Medi-Wheels for purchase, but drivers could purchase them anywhere and many drivers had them already. If purchased from Medi-Wheels, they became the property of the drivers, not Medi-Wheels. [Tocci 71:25-72:2; Tocci Decl. ¶ ___; D. Suazo 33:10-14; 35:7-20] Drivers also had to pay for their own fuel. [D. Suazo 28:19-21]  All of these investments in equipment or materials support the finding of an independent contractor status. *See Broome*, 2021 U.S. Dist. LEXIS 261153, at *25 (noting that the fact that plaintiff hoped to take title on a truck "indicates a significant investment in equipment that departs from the 'path of the usual employee.'"); *Beard v. Langham*, 649 F. Supp. 2d 1332, 1341 (S.D. Ala. 2009) (where log haulers owned their own trucks, paid for their own fuel, and were responsible for maintaining their trucks, these facts supported an independent contractor finding); *Browning v. Ceva Freight, LLC*, 885 F. Supp. 2d 590, 608 (E.D.N.Y. 2012) (drivers were responsible for the costs and expenses associated with the vehicle, including maintenance and repair. Thus, this factor weighs in favor of independent contractor status); *Chebotnikov v. LimoLink, Inc.*, 2017 WL 2888713, at *13 (D. Mass.) ("Plaintiff's investment in their own equipment also weighs in favor of finding independent-contractor status. Plaintiffs purchased and maintained their own vehicles and paid their own insurance premiums, which entail "considerable costs" not normally borne by employees.").

**(4) Whether the Services Rendered Required a Special Skill**

Defendant does not dispute the Secretary's contention that the drivers' jobs did not require special skills or initiative.

**(5) Degree of Permanency and Duration of the Working Relationship**

The Secretary points out that over 40 percent of drivers were employed for one or more years during the Relevant Time Period. Stated another way, nearly 60 percent of drivers were employed for less than one year. As noted in *Chavez v. Arancedo*, No. 17-20003-Civ, 2018 U.S. Dist. LEXIS 162898, at *1 (S.D. Fla. Sep. 24, 2018), "[c]ourts within our circuit have found that a working relationship "for less than one year is 'transient or itinerant' and signal[s] independent contractor status." (citing *Rezendes v. Domenick's Blinds & Decor, Inc.*, 2015 U.S. Dist. LEXIS 71075, 2015 WL 3484835, at *12 (M.D. Fla. June 2, 2015) (quoting *Clincy v. Galardi S. Entertainers*, 808 F. Supp. 2d 1326, 1348 (N.D. Ga. 2011)). *See also Amponsah v. DirecTV, LLC*, 278 F. Supp. 3d 1352, 1362 (N.D. Ga. 2017) (noting that "Plaintiffs' work relationships were generally short and transient: five Plaintiffs performed satellite installations for less than a year, and four of them often moved from company to company.") The short duration of most of the drivers' tenure with Medi-Wheels signals independent contractor status.[3]

A worker's lack of exclusivity in their relationship with the putative employer and their ability to reject assignments also signal independent contractor status. In *Scantland*, the defendant argued that a technician's ability to work for other installation contractors is significant. The Eleventh Circuit agreed, stating "[e]xclusivity is relevant." 721 F.3d at 1319. Similarly, in *Freund v. Hi-Tech Satellite, Inc.*, 185 F. App'x 782, 784 (11th Cir. 2006) the Eleventh Circuit affirmed the district court's conclusion that the plaintiff's relationship with the company was not one with a significant degree of permanence because he was able to take jobs from other companies and could take as many or as few jobs as he desired. In *Galarza v. One Call Claims, LLC*, No. 1:21-00250-N, 2023 U.S. Dist. LEXIS 152211, at *29-30 (S.D. Ala. Aug. 29, 2023), the court noted that plaintiffs' having control over whether they would accept further assignments was indicative of a lack of "permanence" and "duration" and thus favored independent contractor rather than employee status.

---

[3] *See also Velu v. Velocity Exp., Inc.*, 666 F. Supp. 2d 300, 307 (E.D.N.Y. 2009) (even where the duration of employment is greater than one year, or even perpetual, the fact that a worker "could go out the next day with the same van, clothes, equipment, computer, printer, and other supplies, and immediately work for another [company]" is indicative of an independent contractor relationship).

Here, the drivers did not have an exclusive relationship with Medi-Wheels. As noted above, during the relevant period, some drivers drove for other companies such as Uber, Lyft, and Door Dash. [Sabata Dec. ¶ 1; Rengifo Dec. ¶ 1; Fuller Dec. ¶ 1; Tocci 137:1-11; 139:3-4] Drivers were also free to perform "personals," i.e., transportation for clients who called the drivers directly. [Tocci 62:15-63:11; 138:25-139:1] Drivers were also free to decline assignments from Medi-Wheels. [Sabata Dec. ¶ 4; Winfrey Dec. ¶ 5; Rengifo Dec. ¶ 3; Longobardi Dec. ¶ 3; Fuller Dec. ¶ 2; Tackett Dec. ¶ 3.; Tocci 78:19-23; 80:11-16] Drivers declined assignments based on the price of the fare, the geographic area of the trip, a conflict in their schedule, or for other reasons. [Tocci 106:15-107:5; 109:2-12] All of these facts signal an independent contractor status under Eleventh Circuit case law.

### (6) Extent to Which the Service Rendered is an Integral Part of the Alleged Employer's Business

Medi-Wheels discontinued providing non-emergency medical transportation on December 1, 2022. [Tocci 135:19-136:19] Defendant does not dispute that the drivers' services were an integral part of Medi-Wheels' business during the relevant period. However, this fact alone does not indicate an employment relationship. *See Chao*, 16 F. App'x at 107 (noting that although installers were integral to MAT's business, "this factor, standing alone, does not create an employment relationship between the Installers and MAT."); *Freund*, 185 Fed. Appx. at 785 (affirming district court's determination of independent contractor status despite the fact that Freund's services were an integral part of Hi-Tech's business); *see also Fernandez v. Kinray, Inc.*, 406 F. Supp. 3d 256, 263–64 (E.D.N.Y. 2018) ("Even if Plaintiffs were integral to the Defendants' business, the services performed by Plaintiffs could be readily performed by others, weighing in favor of an independent contractor classification."); *Velu v. Velocity Exp., Inc.*, 666 F. Supp. 2d 300, 307 (E.D.N.Y. 2009) (similar); *Jones v. Pawar Bros. Corp.*, 434 F. Supp. 3d 14, 26 (E.D.N.Y. 2020) ("[T]he extent to which the work was an integral part of the employer's business [does not] compel[] a finding of employee status, because even though Plaintiff driving a tow truck was integral to Defendants' towing business, he was easily replaced, just as he was the replacement for others.").

**2. Enterprise Coverage is Relevant Only if the Drivers Were Employees.**

The Secretary points out on page 13 of her Motion that Defendant concedes that it is a "covered enterprise" within the meaning of § 3(r) of the Act, 29 U.S.C. § 203(r), and is thus

12

subject to "enterprise coverage." "Therefore, the Drivers are covered by the Act to the extent they are 'employees' of Defendant." *Id*. Defendant does not dispute this point of law. However, as explained above, the evidence reveals significant disputed issues of material fact regarding the drivers' status as employees versus independent contractors that preclude the entry of summary judgment in the Secretary's favor.

### 3. Disputed Issues of Material Fact Exist on Whether Defendant Violated the FLSA.

For the same reason, the violations of the FLSA the Secretary alleges on pages 13 and 14 of her Motion would exist only if the drivers are found to be employees. Significant disputed issues of material fact on this issue preclude the entry of summary judgment in the Secretary's favor.

### 4. The Secretary's Calculation of Back Wages is Unreasonable.

The Secretary's calculation of back wages is unreasonable because it omits from the calculation the downtime drivers had between trips during which time they were free to take breaks and meals and were otherwise fully relieved of responsibilities. Under case law and Department of Labor regulations, bona fide rest breaks of at least 20 minutes and meal breaks of at least 30 minutes are excluded from time worked for purposes of the FLSA's minimum wage and overtime requirements.[4]

The Transitrak data reflects numerous periods between rides (i.e., after discharging one passenger and before picking up another passenger) where drivers were completely relieved of duty.  For example, Transitrak data reflects that Driver Earnest Alfred[5] worked with Medi-Wheels from March 5, 2021 to August 4, 2022 (approximately 74 work weeks).  During that time, Mr. Alfred was compensated for 3,338 passenger trips. There were 1,482 situations where the gap between drop off and pickup on rides on the same day were 20 minutes or more. On 422 situations, the gap exceeded one hour. *See* 29 C.F.R. § 785.16(a) ("Periods during which an employee is completely relieved from duty and which are long enough to enable him to use the time effectively for his own purposes are not hours worked."); 29 C.F.R. § 785.41 ("An

---

[4] *See* Department of Labor Field Operations Handbook ¶ 31a01; *Rest Periods*.  "Where a regular rest period of known duration is longer than 20 minutes, [and] if the employees are free to go where they please, and the rest period is long enough to permit the employees to use it for their own purposes, and if bona fide and not an attempt to evade or circumvent the [FLSA], such periods are not hours worked.

[5] Mr. Alfred was not cherrypicked.  His name appears first alphabetically.

13

employee who drives a truck, bus, automobile, boat or airplane, or an employee who is required to ride therein as an assistant or helper, is working while riding, except during bona fide meal periods ...." (emphasis added)); *Chao v. Tyson Foods, Inc.*, 568 F. Supp. 2d 1300, 1310 (N.D. Ala. 2008) (employees who were free to leave plant to perform personal errands, eat at local restaurants, or go home during rest break had been completely relieved from duty during that break and time was thus noncompensable under FLSA).

### 5. Liquidated Damages

Numerous issues of disputed material facts preclude the Court from finding an FLSA violation in this case. Therefore, the issue of liquidated damages is premature. *See Cusumano v. Maquipan Int'l, Inc.*, 390 F. Supp. 2d 1216, 1223 (M.D. Fla. 2005) (holding that in the absence of a determination of an FLSA violation, consideration of the issue of liquidated damages, and thus the associated affirmative defense of good faith, is premature.)

Moreover, even assuming *arguendo* that the court were to determine on summary judgment that Medi-Wheels violated the FLSA, the issue of liquidated damages would still be premature. The FLSA provides that if "the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [FLSA] . . . the court may, in its sound discretion, award no liquidated damages. . . .". The good faith defense has subjective and objective components. *Dybach v. State of Fla. Dept. of Corrections*, 942 F.2d 1562, 1566 (11th Cir. 1991) (quoting *Bratt v. Cty. of Los Angeles*, 912 F.2d 1066, 1071-72 (9th Cir. 1990)). To satisfy the subjective component, the employer must show it had "an honest intention to ascertain what [the Act] requires and to act in accordance with it." *Id*. at 1566 (quoting *Brock v. Shirk*, 833 F.2d 1326, 1330 (9th Cir. 1987)). For the objective component, the employer must show that it had reasonable grounds for believing that its conduct comported with the FLSA. *Id*. (quoting 29 C.F.R. § 790.22(c)). In many cases, the good faith decision is better off being decided at trial, when the Court will have the benefit of further factual development. *See, e.g., Devivo v. Adams Homes of Nw. Fla.*, No. 8:20-cv-872-MSS-AAS, 2021 U.S. Dist. LEXIS 231015, at *29 (M.D. Fla. Dec. 2, 2021).

In this case, with respect to the drivers at issue, i.e., those who performed non-emergency medical transportation, Medi-Wheels' business model mimicked the Yellow Cab model under which the majority of the drivers that Medi-Wheels hired had worked in the past. [Tocci 17:22-25; 19:9-20:1; 41:12-42:5] Yellow Cab had similar contracts with Providers such as LogistiCare,

14

MTM, and Access2Care to provide non-emergency medical transportation. [Tocci 21:20-23] Dominick Tocci, who would later become Medi-Wheels' Vice President and Chief Financial Officer [Tocci 9:25-10:1; 135:9-10], came to Florida in 2012 or 2013 and began working for Yellow Cab company as Comptroller. [Tocci 12:22-25] Yellow Cab treated its drivers as independent contractors. [Tocci Dec. ¶ 4] Tocci believed that the drivers at Yellow Cab were properly classified as independent contractors in compliance with the FLSA because, among other reasons, they had significant freedom to control whom they worked for, when they worked, where they worked, and how they worked, and they invested in their own equipment to perform their work. [Tocci Dec. ¶ 5] This conclusion was buttressed by the fact that, to the best of Tocci's knowledge, Yellow Cab was never the subject of wage and hour investigation or a wage claim. [Tocci 13:14-25; Tocci Dec. ¶ 6]

Tocci began working for Medi-Wheels around 2014 or 2015. [Tocci 10:7-11] In July 2020, Medi-Wheels began performing non-emergency medical transportation and hired many of the same drivers who had done the same work at Yellow Cab. [Tocci 20:16-20; 135:3-5, Tocci Dec. ¶ 8] Medi-Wheels' business model mimicked the Yellow Cab model under which the majority of the drivers that Medi-Wheels hired had worked in the past. [Tocci 17:22-25; 19:9-20:1; 41:12-42:5] Tocci sincerely believed that his implementation of the same business model at Medi-Wheels complied with the FLSA. [Tocci Dec. ¶ 10] Given the facts of this case, Defendant submits that this belief was objectively reasonable. Accordingly, the Court should deny the Secretary's request to enter summary judgment against Medi-Wheels on the issue of liquidated damages.

### 6. Injunctive Relief

Whether to grant an injunction for an FLSA violation is "within the court's sound discretion." *Solis v. A-1 Mort. Corp*, 934 F.Supp.2d 778 (W.D. Pa. 2013) (citations omitted). In deciding whether to grant an injunction, courts consider the employer's past conduct, the employer's current conduct, and, most importantly, whether the employer can be counted on to comply with the FLSA in the future. *Id*. (citations omitted)

The Secretary requests an order enjoining Medi-Wheels from violating the FLSA but fails to mention that Medi-Wheels discontinued providing non-emergency medical transportation on December 1, 2022. [Tocci 135:19-136:19] The Secretary fails to support her request for injunctive relief with any evidence of current violations of the FLSA, or any evidence of any likelihood of future violations. Accordingly, the Secretary's request for injunctive relief should

be denied. *See Donovan v. Kentwood Dev. Co.*, 549 F. Supp. 480, 490 (D. Md. 1982) (denying injunctive relief as to future violations by defendant, which were unlikely because it was a non-operating corporation with no employees).

### 7. Affirmative Defenses

Defendant concedes that it cannot establish the applicability of the taxicab exemption (affirmative defense no. 2) or a statute of limitations defense (affirmative defense no. 7). Additionally, because it appears that the Secretary is not seeking compensation for the drivers based on preliminary or postliminary activities (affirmative defense no. 4) or for *de minimis* working time (affirmative defense no. 6), these defenses are moot.

However, Defendant contends that for the reasons stated in section 4 above, the Secretary's calculation of back wages is unreasonable. In particular, Defendant contends that there are significant, disputed issues of material fact on the issues of breaks and meal periods that preclude the entry of summary judgment in the Secretary's favor on Defendant's third and fifth affirmative defenses.

Affirmative Defense number 3 states: "Defendant is not subject to liability under the FLSA for any alleged failure to pay overtime compensation for periods of time in which Defendant did not know or have reason to know that the drivers at issue were working." This defense states the correct legal standard for liability under the FLSA. *See Bailey v. TitleMax of Ga., Inc.*, 776 F.3d 797, 801 (11th Cir. 2015) ("An unpaid-overtime claim has two elements: (1) an employee worked unpaid overtime, and (2) the employer knew or should have known of the overtime work."). This defense is also supported by record evidence. As noted above, the evidence shows that during the day, if the drivers had downtime, they could go home and take a nap or do chores. [Sabata Dec. ¶ 4] For example, a dialysis appointment takes about four hours. If a driver was scheduled to do a round trip, the driver could do whatever he wanted after dropping off the patient at the appointment before picking up the patient at the end of the appointment. [Tocci 98:5-19] This period of time is not compensable under the FLSA. *See* 29 C.F.R. § 785.16(a) ("Periods during which an employee is completely relieved from duty and which are long enough to enable him to use the time effectively for his own purposes are not hours worked.").

Affirmative Defense number 5 states: "All or part of the time which Plaintiff seeks compensation on behalf of the drivers does not constitute compensable working time, including all meal periods in accordance with 29 C.F.R. § 785.19." This defense comports with FLSA

16

regulations, which state that bona fide meal periods, which are typically periods of 30 minutes or more in which the employee is completely relieved of duty, "are not worktime." 29 C.F.R. § 785.19(a). This defense is also supported by record evidence. As noted above, Sabata testified that that during the day, if the drivers had downtime, they could go home and take a nap or do chores. [Sabata Dec. ¶ 4] Tocci similarly testified that drivers often had downtime of more than 30 minutes between trips, during which time they were free to take breaks and meals. [Tocci 104:17-25; Tocci Dec. ¶ 11] The existence of these facts precludes the entry of summary judgment in the Secretary's favor on Defendant's third and fifth affirmative defenses.

## CONCLUSION

Based on the foregoing, Defendant requests that the Court deny the Secretary's Motion for Summary Judgment.

Respectfully submitted,

*/s/Richard D. Tuschman*
Richard D. Tuschman, Esq.
Florida Bar No. 907480
E-mail: rtuschman@gtemploymentlawyers.com
2nd E-mail: assistant@gtemploymentlawyers.com
**RICHARD D. TUSCHMAN, P.A.**
12555 Orange Drive, 2nd Floor
Davie, Florida 33330
Tel. (954) 369-1050
Fax. (954) 380-8938

and

*/s/ Mark J. Beutler*
Mark J. Beutler, Esq.
Florida Bar No. 0023400
Email: mjb@mjbpa.com
2nd Email: jmm@mjbpa.com
**LAW OFFICES OF MARK J. BEUTLER, P.A.**
9400 South Dadeland Blvd., Suite 600
Miami, Florida 33156
Tel. (305) 487-0942
Fax. (786) 513-4651

*Counsel for Defendant*

Case No. 9:23-cv-80505-RLR

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on <u>March 1, 2024</u>, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

*/s/ Richard D. Tuschman*
Richard D. Tuschman

## SERVICE LIST

SEEMA NANDA
Solicitor of Labor
TREMELLE I. HOWARD
Regional Solicitor
KRISTIN R. MURPHY
Acting Counsel
LYDIA J. CHASTAIN
Senior Trial Attorney
Special Bar No. A5501398
chastain.lydia.j@dol.gov
**OFFICE OF THE SOLICITOR**
**U.S. DEPARTMENT OF LABOR**
61 Forsyth Street, S.W. Room 7T10
Atlanta, GA 30303
(404) 302-5449 (Phone)
(404) 302-5438 (Fax)
atl.fedcourt@dol.gov

*Counsel for Acting Secretary of Labor,*
*United States Department of Labor*

SOL Case No. 22-00245