**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Palm Beach Division**

JULIE A. SU,
Acting Secretary of Labor,
United States Department of Labor,

    Plaintiff,

vs.

MEDI-WHEELS OF THE PALM
BEACHES, INC.,

    Defendant.
_____/

Case No. 9:23-cv-80505-RLR

**DEFENDANT'S RESPONSE TO PLAINTIFF'S STATEMENT OF MATERIAL FACTS
FOR WHICH PLAINTIFF CONTENDS THERE IS NO GENUINE ISSUE TO BE TRIED**

    Defendant, MEDI-WHEELS OF THE PALM BEACHES, INC., through its undersigned counsel, pursuant to Local Rule 56.1, hereby files this Response to Plaintiff's Statement of Material Facts for Which Plaintiff Contends There is No Genuine Issue to be Tried [D.E. 26]. Defendant's statement of Additional Facts begins at page 6 of this Response. The Additional Facts cited herein are contained in the declarations of Amy Sabata (Ex. A), David Winfrey (Ex. B), Luis Rengifo (Ex. C), Michael Longobardi (Ex. D), Renae Fuller (Ex. E), Robert Tackett (Ex. F), Dominick Tocci (Ex. G), or in the depositions of Dominick Tocci (Ex. H), Diogenes Suazo (Ex. I), or Johnny Suazo (Ex. J).

**RESPONSE TO PLAINTIFF' STATEMENT OF MATERIAL FACTS**

**Jurisdiction, Venue, and Enterprise Coverage Under the Act**

1. Undisputed.
2. Undisputed.
3. Undisputed.
4. Undisputed.
5. Undisputed.
6. Undisputed.

7. Undisputed.

8. Undisputed.

9. Undisputed.

10. Undisputed.

**(1)  Medi-Wheels' Control over the Drivers' Work:**

11. Undisputed.

12. Undisputed.

13. Undisputed.

14. Undisputed.

15. Undisputed.

16. Undisputed.

17. Undisputed.

18. Undisputed.

19. Disputed to the extent that the phrase "produce their vehicles for inspection" implies that Medi-Wheels performed the inspections. Defendant scheduled the inspections but did not perform them. [Vega 33:17-34:3]

20. Undisputed.

21. Undisputed.

22. Undisputed.

23. Undisputed.

24. Undisputed.

25. Undisputed.

26. Undisputed.

27. Disputed. Drivers were free to decline assignments from Medi-Wheels. [Sabata Dec. ¶ 4; Winfrey Dec. ¶ 5; Rengifo Dec. ¶ 3; Longobardi Dec. ¶ 3; Fuller Dec. ¶ 2; Tackett Dec. ¶ 3.; Tocci 78:19-23; 80:11-16] Drivers were able to and did decline assignments based on the price of the fare, the geographic area of the trip, a conflict in their schedule, or for other reasons. [Tocci 106:15-107:5' 109:2-12] For example, when Amy Sabata hurt her back and could not assist patients with wheelchairs or walkers, she declined these assignments. [Sabata Dec. ¶ 4]

Drivers were also able to and frequently did call Medi-Wheels' dispatchers to change their assignments. [Tocci 82:19-23; 106:12]

  28.  Undisputed.

  29.  Undisputed.

  30.  Undisputed.

  31.  Disputed. The Providers, not Medi-Wheels, required that drivers indicate within the Transitrak application when they arrived at the pick-up site and when they completed the passenger drop-off. [Tocci Dec. ¶ 15]

  32.  Undisputed.

  33.  Undisputed.

  34.  Undisputed.

  35.  Disputed. The Providers' contracts required that the drivers wear a Medi-Wheels shirt, but Medi-Wheels did not enforce this rule. [Tocci 69:13-25] Several drivers did not wear Medi-Wheels shirts or believed that it was not a requirement. [Sabata Dec. ¶ 5; Rengifo Dec. ¶ 5; Longobardi Dec. ¶ 5; Fuller Dec. ¶ 5; Tackett Dec. ¶ 5]

  36.  Disputed. The drivers were given magnetic Medi-Wheels signs for their cars, but many drivers did not use them, and Medi-Wheels did not pressure them to do so. [Tocci 70:1-15]

  37.  Undisputed.

  38.  Disputed. Drivers often had downtime of more than 30 minutes between trips, during which time they were free to take breaks and meals. [Tocci Dec. ¶¶ 11, 12] In fact, even when there were not more than 30 minutes between scheduled trips, drivers often took 30 minutes or more to eat, and would arrive late to the next scheduled trip. Drivers were typically not penalized for being late. [Id., ¶ 11]

  39.  Disputed. Drivers often had downtime of more than 30 minutes between trips, during which time they were free to take breaks and meals. [Tocci Dec. ¶¶ 11, 12] In fact, even when there were not more than 30 minutes between scheduled trips, drivers often took 30 minutes or more to eat, and would arrive late to the next scheduled trip. Drivers were typically not penalized for being late. [Id., ¶ 11]

  40.  Disputed. During the relevant period, some drivers drove for other companies such as Uber, Lyft, and Door Dash. [Sabata Dec. ¶ 1; Rengifo Dec. ¶ 1; Fuller Dec. ¶ 1; Tocci 137:1-11; 139:3-4]

  41.  Undisputed.

**(2)     Opportunity for profit or loss depending on their managerial skill:**

42.     Undisputed.

43.     Disputed. Drivers were free to decline assignments from Medi-Wheels. [Sabata Dec. ¶ 4; Winfrey Dec. ¶ 5; Rengifo Dec. ¶ 3; Longobardi Dec. ¶ 3; Fuller Dec. ¶ 2; Tackett Dec. ¶ 3.; Tocci 78:19-23; 80:11-16] Drivers were able to and did decline assignments based on the price of the fare, the geographic area of the trip, a conflict in their schedule, or for other reasons. [Tocci 106:15-107:5' 109:2-12] For example, when Amy Sabata hurt her back and could not assist patients with wheelchairs or walkers, she declined these assignments. [Sabata Dec. ¶ 4] Drivers were also able to and frequently did call Medi-Wheels' dispatchers to change their assignments. [Tocci 82:19-23; 106:12]

44.     Undisputed.

45.     Disputed. Drivers knew the rate per mile that each Provider paid, and the name of the Provider and mileage of each trip was included in the trip information; therefore, the payment for each ride was a matter of simple arithmetic. [Tocci Dec. ¶ 14]

46.     Undisputed.

47.     Disputed. Drivers knew the rate per mile that each Provider paid, and the name of the Provider and mileage of each trip was included in the trip information; therefore, the payment for each ride was a matter of simple arithmetic. [Tocci Dec. ¶ 14]

**(3)     The alleged employee's investment in equipment or materials required for his task, or his employment of workers:**

48.     Undisputed.
49.     Undisputed.
50.     Undisputed.
51.     Undisputed.
52.     Undisputed.
53.     Undisputed.
54.     Undisputed.

**(4)     Whether the service rendered requires a special skill:**

55.     Undisputed, but for clarification these were the requirements of the insurance company client's (in this case, LogistiCare's) contract with Medi-Wheels. [Vega 26:9-27:10]

56.     Undisputed, but for clarification these were the requirements of the insurance company client's contract with Medi-Wheels. [Vega 41:1-23]

**(5)     The degree of permanency and duration of the working relationship:**

57.     Undisputed.

58.     Undisputed.

59.     Disputed. During the relevant period, some drivers drove for other companies such as Uber, Lyft, and Door Dash. [Sabata Dec. ¶ 1; Rengifo Dec. ¶ 1; Fuller Dec. ¶ 1; Tocci 137:1-11; 139:3-4]

**(6)     The service rendered is an integral part of the alleged employer's business:**

60.     Undisputed.

61.     Undisputed.

**(7) Recordkeeping Violations, Overtime Violations, Minimum Wage Violations - Back Wages and Liquidated Damages**

62.     Undisputed.

63.     Undisputed.

64.     Undisputed.

65.     Undisputed. However, more typically, drivers were not penalized for being late or for violating the Providers' other rules. [Tocci 28:6-16; 69:9:1-70:15 Tocci Dec. ¶ 11; Sabata Dec. ¶ 5; Rengifo Dec. ¶ 5; Longobardi Dec. ¶ 5; Fuller Dec. ¶ 5; Tackett Dec. ¶ 5]

66.     Undisputed.

67.     Undisputed, albeit the situation was rare and precipitated by the fact that drivers performed little work and the fixed fee for the insurance and permit reduced the net wages. [Tocci Dec., ¶¶ 16-17]

68.     Undisputed.

69. Disputed. This was a requirement of the Providers, not Medi-Wheels. [Tocci Dec. ¶ 15]

70. Undisputed.

71. Undisputed. However, Defendant disputes that the assumptions underlying this methodology is correct. Drivers often had downtime of more than 30 minutes between trips, during which time they were free to take breaks and meals. [Tocci Dec. ¶¶ 11, 12] If the drivers had downtime, they could go home and take a nap or do chores. [Sabata Dec. ¶ 4]

72. Disputed. The word "often" is imprecise, and there were many weeks in which the drivers did not work more than 40 hours per week. [Tocci Dec. ¶ 13]

73. Undisputed.

74. Undisputed.

75. Undisputed.

76. Undisputed. However, Defendant disputes the validity of these calculations because they do not take into account the drivers' non-working time between trips. Drivers often had downtime of more than 30 minutes between trips, during which time they were free to take breaks and meals. [Tocci Dec. ¶¶ 11, 12] If the drivers had downtime, they could go home and take a nap or do chores. [Sabata Dec. ¶ 4]

77. Undisputed.

78. Undisputed.

*[Additional Facts begins on following page]*

Case No. 9:23-cv-80505-RLR

## ADDITIONAL FACTS

**Medi-Wheels' Non-Emergency Medical Transportation Business**

79. Dominick Tocci is Medi-Wheels' Vice President and Chief Financial Officer. [Tocci 9:25-10:1; 135:9-10]

80. Tocci came to Florida in 2012 or 2013 and began working for Yellow Cab company as Comptroller. [Tocci 12:22-25]

81. Yellow Cab treated the drivers as independent contractors and, to the best of Tocci's knowledge, was never the subject of wage and hour investigation or a wage claim. [Tocci 13:14-25]

82. Tocci was introduced to Medi-Wheels, which was a subcontractor for Yellow Cab, around June of 2013. [Tocci 13:2-6]

83. Tocci began working for Medi-Wheels around 2014 or 2015. [Tocci 10:7-11]

84. In July 2020, Medi-Wheels began performing non-emergency medical transportation. [Tocci 20:16-20; 135:3-5]

85. For the drivers at issue in this case, i.e., those who performed non-emergency medical transportation, Medi-Wheels' business model mimicked the Yellow Cab model under which the majority of the drivers that Medi-Wheels hired had worked in the past. [Tocci 17:22-25; 19:9-20:1; 41:12-42:5]

86. In fact, Yellow Cab had similar contracts with insurance providers ("Providers") such as LogistiCare, MTM, and Access2Care to provide non-emergency medical transportation. [Tocci 21:20-23]

87. Medi-Wheels had a meeting with a group of drivers and explained the business model to them, and the drivers all agreed to this model. [Tocci 19:9-20]

88. Under this model, the fare for the trip was paid to the drivers, and the drivers, in turn paid a weekly $350 leasing fee to Medi-Wheels and a five percent voucher fee, which essentially was a billing fee. [Tocci 25:2-7; 33:15]

89. Medi-Wheels did not cover any of the expenses associated with the drivers' vehicles or business. [Sabata Dec. ¶ 3; Rengifo Dec. ¶ 4; Longobardi Dec. ¶ 4; Fuller Dec. ¶ 4; Tackett Dec. ¶ 5]

90. The leasing fee covered liability insurance, permit fees, and other expenses that the company incurred. [Id.; Tocci Dec. ¶ 16]

91. The leasing fee was deducted from the drivers' weekly settlement checks from

Medi-Wheels. [Id.]

92. The insurance did not cover comprehensive ("comp") or collision coverage, which the drivers had to pay for separately. [Sabata Dec. ¶ 3]

93. Drivers had to pay for their own fuel. [D. Suazo 28:19-21]

94. Drivers also had to pay for a DOT physical every two years and for online training, which were requirements of the Providers' contracts. [Sabata Dec. ¶ 3; Tocci 43:12-24]

95. Medi-Wheels discontinued providing non-emergency medical transportation on December 1, 2022. [Tocci 135:19-136:19]

**The Drivers Were Free to Work for Other Companies or for Themselves**

96. During the relevant period, some drivers drove for other companies such as Uber, Lyft, and Door Dash. [Sabata Dec. ¶ 1; Rengifo Dec. ¶ 1; Fuller Dec. ¶ 1; Tocci 137:1-11; 139:3-4]

97. Drivers were also free to perform "personals," i.e., transportation for clients that call the drivers directly. [Tocci 62:15-63:11; 138:25-139:1]

98. Some drivers had their own business cards which had their own company name on them. [Tocci 68:6-10; 138:4-8]

99. For example, David Winfrey had his own business cards, which he handed out to customers and prospective customers. [Winfrey Dec. ¶ 4]

100. Winfrey received about 30% of his work from Medi-Wheels; the rest came from other sources, including word of mouth and the car line at the airport. [Winfrey Dec. ¶ 4]

101. Winfrey operated his own business and had one or two drivers who worked for him and drove for Medi-Wheels. [Tocci 64:21-65:3]

**Drivers Set Their Own Schedules and Worked as Much or as Little as They Wanted**

102. Drivers set their own schedules. [Sabata Dec. ¶ 4; Winfrey Dec. ¶ 5; Rengifo Dec. ¶ 3; Longobardi Dec. ¶ 3; Fuller Dec. ¶ 2; Tackett Dec. ¶ 3]

103. Drivers received assignments from Medi-Wheels via the Transitrak application (dispatch software) but fit the assignments into the drivers' schedules based on their availability. [Sabata Dec. ¶ 4; Winfrey Dec. ¶ 5; Rengifo Dec. ¶ 3; Longobardi Dec. ¶ 3; Fuller Dec. ¶ 2; Tackett Dec. ¶ 3; Tocci 78:12-18; 80:17-23; 89:17-22]

104. Drivers were free to decline assignments from Medi-Wheels. [Sabata Dec. ¶ 4; Winfrey Dec. ¶ 5; Rengifo Dec. ¶ 3; Longobardi Dec. ¶ 3; Fuller Dec. ¶ 2; Tackett Dec. ¶ 3.; Tocci 78:19-23; 80:11-16]

105. For example, when Amy Sabata hurt her back and could not assist patients with wheelchairs or walkers, she declined these assignments. [Sabata Dec. ¶ 4]

106. Drivers had input as to when and where they wanted to work, and Medi-Wheels assigned trips to drivers based on these parameters. [Tocci 80:17-81:6; D. Suazo 56:21-57:3]

107. Drivers often had downtime of more than 30 minutes between trips, during which time they were free to take breaks and meals. [Tocci 104:17-25; Tocci Dec. ¶¶ 11, 12]

108. During the day, if the drivers had downtime, they could go home and take a nap or do chores. [Sabata Dec. ¶ 4]

109. For example, a dialysis appointment takes about four hours. If a driver was scheduled to do a round trip, the driver could do whatever he wanted after dropping off the patient at the appointment before picking up the patient at the end of the appointment. [Tocci 98:5-19]

110. Medi-Wheels did not guarantee any particular volume of work. [Sabata Dec. ¶ 4; Tocci 81:18-24; 90:6-91:2]

111. It was the drivers' decision how much to work. [Sabata Dec. ¶ 4; Winfrey Dec. ¶ 5; Rengifo Dec. ¶¶ 3 and 6; Longobardi Dec. ¶ 3; Fuller Dec. ¶ 2; Tackett Dec. ¶ 3; Tocci 116:5-9]

112. Drivers were not required to obtain permission from Medi-Wheels before taking time off for vacation or other personal reasons. [Sabata Dec. ¶ 5; Winfrey Dec. ¶ 7; Longobardi Dec. ¶ 3; Fuller Dec. ¶ 2; Tackett Dec. ¶ 3]

113. For example, Amy Sabata frequently travelled out of town on short vacations, so she simply notified Medi-Wheels before taking time off. [Sabata Dec. ¶ 5]

114. Similarly, Robert Tackett told Medi-Wheels' dispatcher Mike Stone he was going take a month off. Stone said, "Okay, let me know when you're ready to come back." [Tackett Dec. ¶ 3]

115. Tackett also decided at some point for personal reasons only to work until noon. [Tocci 116:10-19]

**The Providers – Not Medi-Wheels – Set Hiring Standards, Required Training, Performed Inspections, and Established Rules**

116. The Providers – not Medi-Wheels – required the drivers to submit to drug testing and a medical examination. [Tocci 35:18-20]

117. The Providers – not Medi-Wheels – also established certain rules for hiring

9

drivers. For example, the Providers required that Medi-Wheels not use any drivers who were convicted of three or more minor motor vehicle moving violations within the previous 24 months. [Tocci 35:23-36:2]

118. The Providers – not Medi-Wheels – required training on driving safety, CPR, and first aid. [Sabata Dec. ¶ 3; Fuller Dec. ¶ 5]

119. The training was standard for the industry and was administered online by an outside agency. [Tocci 34:13-25]

120. The training certificates the driver obtained were valid for two or three years and, if the drivers left Medi-Wheels, they could use it at a different company. [Tocci 35:3-8]

121. Medi-Wheels did not train the drivers because they had previous experience performing non-emergency medical transportation; "they already knew what they were doing." [Tocci 44:3-12; D. Suazo 37:2-8]

122. The Providers also had certain rules, such as not using the cell phone will driving, and no eating, drinking, or smoking in the vehicle. [Sabata Dec. ¶ 3; Fuller Dec. ¶ 5]

123. These rules were set by the Providers, not by Medi-Wheels. [Sabata Dec. ¶ 3; Fuller Dec. ¶ 5]

124. Medi-Wheels did not actively enforce compliance with these rules; only if a complaint was received would Medi-Wheels remind the driver of the obligations of the Provider's contract. [Tocci 28:6-16]

125. Medi-Wheels did not itself provide the drivers with a handbook or a list of rules or procedures they had to follow. [Tocci 28:17-21; 54:19-24]

126. Nor did Medi-Wheels perform spot checks of drivers to ensure that the drivers were following the Providers' rules. [Tocci 29:4-7]

127. Medi-Wheels did not survey passengers to gauge their satisfaction with the drivers' services. [Tocci 29:10-13]

128. The Providers – not Medi-Wheels – performed inspections of the drivers' vehicles. [Tocci 31:10-24; 67:8-21]

129. To provide for passenger safety, the Providers' contracts required that the drivers wear a Medi-Wheels shirt, but Medi-Wheels did not enforce this rule. [Tocci 69:13-25; Tocci Dec. ¶ 19]

130. Several drivers did not wear Medi-Wheels shirts or believed that it was not a requirement. [Sabata Dec. ¶ 5; Rengifo Dec. ¶ 5; Longobardi Dec. ¶ 5; Fuller Dec. ¶ 5; Tackett

Dec. ¶ 5]

131. The drivers also were given magnetic Medi-Wheels signs for their cars, but many drivers did not use them, and Medi-Wheels did not pressure them to do so. This requirement too was a passenger safety issue. [Tocci 70:1-15; Tocci Dec. ¶ 19]

132. The drivers were required by the Providers' contracts to purchase first-aid kits, a fire extinguisher, and other safety-related items. [Tocci 71:18-72:9; D. Suazo 34:23-35:9]

133. These items became the property of the drivers, not Medi-Wheels. [Tocci 71:25-72:2; D. Suazo; Tocci Dec. ¶ 18]

**Drivers Made Decisions Concerning their Vehicles that Affected Their Profits**

134. Aside from about four wheelchair-compatible vehicles that Medi-Wheels purchased, the drivers used their own personal vehicles to perform their job. [Tocci 32:4-25]

135. Drivers decided what vehicles to purchase, how to maintain their vehicles, and whether to repair or replace them, buy new tires, etc. [Sabata Dec. ¶ 2; Rengifo Dec. ¶ 2; Longobardi Dec. ¶ 2; Fuller Dec. ¶ 3; Tackett Dec. ¶ 2; D. Suazo 29:20-30:16; J. Suazo 53:25-54:5]

136. For example, Amy Sabata decided to buy a used 2017 Dodge Grand Caravan for $14,000. [Sabata Dec. ¶ 2]

137. In 2022, Sabata decided to replace the vehicle's transmission, which cost her about $3,500-$4,000, rather than buying a new vehicle. [Sabata Dec. ¶ 2]

138. Michael Longobardi made the decision to have the oil changed on his vehicle every 5,000 miles with fully synthetic oil. [Longobardi Dec. ¶ 2]

139. Drivers also decided where to buy fuel for their vehicles. [D. Suazo 28:22-29:3]

140. Such decisions affected the profitability of the drivers' businesses. [Sabata Dec. ¶ 2; Rengifo Dec. ¶ 2; Longobardi Dec. ¶ 2; Fuller Dec. ¶ 3; Tackett Dec. ¶ 2]

Case No. 9:23-cv-80505-RLR

Respectfully submitted,

*/s/Richard D. Tuschman*
Richard D. Tuschman, Esq.
Florida Bar No. 907480
E-mail: rtuschman@gtemploymentlawyers.com
2nd E-mail: assistant@gtemploymentlawyers.com
**RICHARD D. TUSCHMAN, P.A.**
12555 Orange Drive, 2nd Floor
Davie, Florida 33330
Tel. (954) 369-1050
Fax. (954) 380-8938

and

*/s/ Mark J. Beutler*
Mark J. Beutler, Esq.
Florida Bar No. 0023400
Email:  mjb@mjbpa.com
2nd Email: jmm@mjbpa.com
**LAW OFFICES OF MARK J. BEUTLER, P.A.**
9400 South Dadeland Blvd., Suite 600
Miami, Florida 33156
Tel. (305) 487-0942
Fax. (786) 513-4651

*Counsel for Defendant*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 1, 2024, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

*/s/ Richard D. Tuschman*
Richard D. Tuschman

Case No. 9:23-cv-80505-RLR

**SERVICE LIST**

SEEMA NANDA
Solicitor of Labor
TREMELLE I. HOWARD
Regional Solicitor
KRISTIN R. MURPHY
Acting Counsel
LYDIA J. CHASTAIN
Senior Trial Attorney
Special Bar No. A5501398
chastain.lydia.j@dol.gov
**OFFICE OF THE SOLICITOR**
**U.S. DEPARTMENT OF LABOR**
61 Forsyth Street, S.W. Room 7T10
Atlanta, GA 30303
(404) 302-5449 (Phone)
(404) 302-5438 (Fax)
atl.fedcourt@dol.gov

*Counsel for Acting Secretary of Labor,*
*United States Department of Labor*

SOL Case No. 22-00245

13