**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 23-CV-80505-ROSENBERG**

JULIE A. SU, acting Secretary
of Labor, UNITED STATES
DEPARTMENT OF LABOR,

      Plaintiff,

v.

MEDI-WHEELS OF THE
PALM BEACHES, INC.,

      Defendant.

_____/

## ORDER GRANTING THE PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on the Plaintiff's Motion for Summary Judgment at docket entry 27. The Motion has been fully briefed and the Court heard oral argument on the Motion on March 20, 2024. For the reasons set forth below, the Motion is granted and summary judgment is entered in favor of the Plaintiff. To organize this Order, the Court first (**I**) sets forth an introductory explanation of this case before turning to (**II**) the Defendant's liability, (**III**) damages, and (**IV**) the Court's final ruling.

### I.      Introduction

This is a case about transportation, and Defendant Medi-Wheels of the Palm Beaches is a company that provides transportation services to various commercial clients. Some of the Defendant's clients require transportation from the local airport, and the Defendant treats its airport drivers as employees. Some of the Defendant's clients require transportation for non-emergency medical reasons, and the Defendant used to treat its medical drivers as employees. At some point, however, the Defendant decided instead to treat its medical drivers as independent

contractors.  This case is about the Defendant's decision to treat its medical drivers as independent contractors, with the Plaintiff arguing that the decision violated the overtime, minimum wage, and recordkeeping provisions of the federal Fair Labor Standards Act.

The Plaintiff is the United States Department of Labor, and the Department argues that it is entitled to prevail in this case as a matter of law—it is entitled to summary judgment.  As part of its argument, the Department concedes that some of the facts in this case are disputed and, as a result, this Court may not grant summary judgment in the Department's favor on the basis of the disputed facts.  Instead, the Department argues that the undisputed facts in this case are sufficient for summary judgment.  The undisputed facts are therefore critical to the Court's decision and, below, after addressing the law guiding the Court's decision, the Court sets forth a summary of the undisputed facts in this case that are particularly relevant.

## II.    Liability

The Court's analysis on liability necessarily requires the Court to consider the question: What is an employee?  The Supreme Court answered that question by stating that the definition of an employee under the Fair Labor Standards Act is "the broadest definition that has ever been included in any one Act." *United States v. Rosenwasser*, 323 U.S. 360, 363 n.3 (1945).  Given that historically broad definition, the parties agree that the standard this Court must use to determine whether a worker is an employee is the "economic reality" test set forth in the case of *Scantland v. Jeffry Knight, Inc.*, 721 F.3d 1308, 1311 (11th Cir. 2013).

In *Scantland*, the defendant used roaming technicians to repair telecommunications equipment, and the defendant classified the technicians as independent contractors. *Id.* at 1313. Each day, the defendant created and assigned scheduled routes for its technicians. *Id.*  The

defendant also required its technicians to partake in certain training. *Id.* at 1314.  Technicians were monitored and tracked by the defendant and, if they were ever late, they were financially penalized. *Id.*

To decide whether the technicians were employees or independent contractors, the *Scantland* court considered whether the technicians, as a matter of economic reality, were dependent upon the defendant. *Id.* at 1311.  Were the technicians economically dependent, such that they should have been treated as employees?  Or were the technicians not economically dependent, such that the technicians were properly treated as independent contractors?  To answer these questions, *Scantland* analyzed the following factors:

> (1) the nature and degree of the alleged employer's control as to the manner in which the work is to be performed; (2) the alleged employee's opportunity for profit or loss depending upon his managerial skill; (3) the alleged employee's investment in equipment or materials required for his task, or his employment of workers; (4) whether the service rendered requires a special skill; (5) the degree of permanency and duration of the working relationship; and (6) the extent to which the service rendered is an integral part of the alleged employer's business.

*Id.* at 1312.  Applying these factors, the *Scantland* appellate court reversed the trial court's summary judgment ruling that the technicians were independent contractors, finding that, essentially, the defendant controlled all of the meaningful aspects of employment.  To apply *Scantland* to the instant case, this Court analyzes below the undisputed facts relevant to each *Scantland* factor.  For each factor, the Court considers the parties' legal arguments about the factor before addressing the next factor.

1. **Undisputed Facts Relevant to the Defendant's Control Over the Drivers**

<u>Contracts</u>.  In 2020, the Defendant entered into several contracts with medical insurance providers. DE 26 at 3.  Through those contracts, the insurance providers agreed to pay the

Defendant a set amount for medical transportation. *Id.* Soon thereafter, the Defendant had some of its medical drivers sign agreements, wherein the drivers agreed to be considered independent contractors. *Id.* Drivers who did not sign a written agreement had an oral agreement for the same. *Id.* The agreements automatically renewed each year. *Id.* The drivers were hired and fired by the Defendant's CFO and president. *Id.*

Documentation and Training. The Defendant kept a file for each driver, and the file included such information as licensing, driving history, criminal background checks, drug screening records, and proof of completion of required training such as CPR and defensive driving. *Id.* at 4. This training was necessary because the Defendant's clients—insurance providers—required the training. *Id.* When a driver's training was soon to expire, the Defendant reminded the driver to complete the training and required the driver to do so. *Id.*

Vehicle Inspections and Permits. The Defendant imposed other requirements besides training and documentation. For example, the Defendant required the drivers' vehicles to meet certain minimum standards and required the drivers to produce their vehicles for inspection at periodic intervals.[1] *Id.* The Defendant also required the drivers and their vehicles to be covered under the Defendant's commercial insurance policy and provided the necessary permits to the drivers for the vehicles to be operated as vehicles-for-hire. *Id.*

Scheduling. Each day, the Defendant compiled the transportation that its clients required and applied the drivers' availability to their transportation needs. *Id.* To that end, the Defendant created daily pick-up and drop-off schedules and assigned the schedules to the drivers (for ease of reference, the Court refers to these schedules as "routes"). *Id.* The assigned routes were specific—the drivers were told the time and location of each pick-up and drop-off the next day. *Id.*

---

[1] The Defendant was not the business entity that performed the vehicle inspections. DE 32.

Because the purpose of the transportation was medical appointments, there was little flexibility built into the routes as the clients needed to be delivered to their destinations at very specific times. *Id.* Because the parties dispute whether the drivers could refuse an assigned route, the Court assumes that drivers were free to do so; however, it is undisputed that if a driver refused an assigned route the Defendant was under no obligation to provide a different route—the assignment of routes remained in the Defendant's control. *Id.* The Defendant sometimes assigned routes to drivers during a workday, rather than the day prior. *Id.* at 6.

<u>Poor Performance</u>.  If a driver was late or missed a pick-up, the client could assess liquidated damages against the Defendant, who would in turn pass the damages onto the driver. *Id.*

<u>Monitoring</u>.  Drivers had to record when they completed certain tasks, such as when they began and completed their routes. *Id.* The Defendant had the ability to track the drivers using GPS. *Id.* The Defendant also required the drivers to keep cameras in their vehicles that the Defendant could access. *Id.*

<u>Uniforms / Equipment</u>.  Pursuant to the Defendant's rules,[2] the drivers had to wear a uniform that identified them as a driver for the Defendant. *Id.* The Defendant's rules also required the drivers to affix a sign to the vehicle. *Id.* Finally, the Defendant required the drivers to keep certain safety devices in the vehicle. *Id.*

<u>Analysis of the Defendant's Control Over the Drivers</u>

Control is measured by whether the employer or worker dictates the "meaningful" economic aspects of the business. *See Hopkins v. Cornerstone Am.*, 545 F.3d 338, 343 (5th Cir. 2008). Courts have found at summary judgment that drivers were employees in such situations as

---

2 Although the Defendant disputes whether this rule was enforced, the Defendant does not dispute that the rule existed. DE 32. The mere fact that the Defendant may have been lax on its enforcement of its uniform or signage rules does not alter the Court's analysis of the summary judgment evidence.

where the drivers lacked control over prices,[3] received assigned routes,[4] were monitored via GPS,[5] were fined for poor performance,[6] were required to wear uniforms,[7] had to comply with client-driven requirements, such as signage,[8] and where employers had the right to discipline employees for poor performance.[9]

Here, the control factor weighs strongly in favor of a finding that the drivers were employees, not independent contractors.  The Defendant had control over all of the meaningful aspects of the drivers' work, such as the driver and vehicle's appearance, the assignment of the work, and the timing of the work.  While the drivers retained some level of discretion over their daily tasks, as one appellate court has put it: "the lack of supervision over minor regular tasks cannot be bootstrapped into an appearance of real independence." *Usery v. Pilgrim Equip. Co., Inc.*, 527 F.2d 1308, 1312 (5th Cir. 1976).  Courts considering facts similar to the instant case have found that the control factor favors employee status. *E.g., Collinge v. IntelliQuick Deliv, Inc.*, No. 12-CV-00824, 2015 WL 1299369, at *4 (D. Ariz. Mar. 23, 2015) (finding an employer met the control element because it "regulate[d] what the drivers are required to do, within which 'time frame' they must do it, what they are required to wear, and which equipment they must use," as well as using a monitoring system on the drivers).

Thus, while the drivers may have had discretion over the specific streets they took to drive to their assigned destinations, and while the drivers may have been free (with advance notice) to

---

3 *Gaye v. TJD Transp.*, No. H-18-243, 2019 WL 2603290, at *3 (S.D. Tex. June 25, 2019).
4 *Acosta v. Senvoy, LLC*, No. 3:16-CV-2293, 2018 WL 3722210, at *5 (D. Or. July 31, 2018).
5 *Id.*
6 *Id.* at *7.
7 *Id.*
8 *Flores v. Velocity Express, LLC*, 250 F. Supp. 3d 468, 472-73 (N.D. Cal. 2017).
9 *Ingram v. Passmore*, 175 F. Supp. 3d 1328, 1336-37 (N.D. Ala. 2016).

work as little as they wished (albeit at a potential financial loss, given the Defendant's imposition of fixed weekly fees), the Defendant in this case retained the power to punish its drivers with fees and damages, it assigned the routes, it required monitoring systems in the drivers' vehicles, it required uniforms, it required signs, it required equipment,[10] it required inspections, it required training, and it required contracts which renewed automatically.  Even if a driver could decline an assigned route, the driver did so at the Defendant's economic mercy—the Defendant retained the power to offer a replacement route, or not.  Having retained for itself all of the meaningful power in the relationship, the Defendant exerted significant control over the drivers' work.

2.     **Undisputed Facts Relevant to the Drivers' Investment in Equipment and Materials**

Many drivers used their own personal vehicles—they did not use commercial vehicles specifically purchased for the provision of transportation services. DE 26 at 8.  The Defendant required the drivers to purchase various pieces of equipment for their vehicles (such as fire extinguishers) and the Defendant sold those items to the drivers; the Defendant deducted the purchase price of any items from the drivers' paychecks. *Id.*  Drivers paid for their own gas and vehicle maintenance. *Id.*  Drivers also purchased their own commercial liability insurance. *Id.*  Of the 59 drivers in this case, only one hired a "helper" as an employee. *Id.*  Pursuant to the drivers' agreements with the Defendant, all "helpers" had to submit the same paperwork as a driver and had to meet all the same requirements. *Id.*  The Defendant paid each driver in his or her own individual capacity—no driver utilized a limited liability company or other incorporated entity. *Id.*

---

10 Although the Defendant attempts to place the blame for certain requirements (such as medical equipment) on its clients, courts routinely reject such arguments. *E.g., Scantland*, 721 F.3d at 1316.

<u>Analysis of the Drivers' Investment in Equipment and Materials</u>

The parties agree that, with one exception, the drivers did not hire their own employees. *But see Scantland*, 721 F.3d at 1317 (noting that "any helpers were required to be contracted [as technicians] thus precluding the exercise of managerial skill over such helpers").  Relatedly, the parties agree that the drivers predominately used their own personal vehicles.  Cases where the investment factor favored independent contractor status involve significant expenditures, such as trucks that haul logs or other large freight. *See Broome v. CRST Malone, Inc.*, No. 19-CV-01917, 2021 WL 9439798, at \*9-10 (N.D. Ala. Sept. 24, 2021).  Thus, while this factor may favor independent contractor status, it does so only slightly in light of the drivers' small capital expenditures. *See Scantland*, 721 F.3d at 1317-18.

**3.      Undisputed Facts Relevant to the Drivers' Opportunity for Profit and Loss**

The Defendant paid its drivers a set amount per trip, based upon a contract rate the Defendant had with its clients. DE 26 at 7.  As a result of the Defendant's route-assigning system, drivers could not craft or design a route that, at least according to the driver, would be more profitable. *Id.*  Stated differently, the drivers could accept or reject a route, but they could not *choose* a route. *Id.*  Each week the Defendant would provide its drivers with a pay sheet that tabulated the rides completed, the fare for each ride, and deductions that the Defendant took for a licensing fee, a voucher fee, and any additional charges for damages (such as a penalty for a late arrival time). *Id.*

<u>Analysis of the Drivers' Opportunity for Profit and Loss</u>

For the opportunity-for-profit factor to favor independent contractor status, a worker's opportunity for profit must be based upon the worker's exercise of managerial skill. *Schultz v.*

*Capital Int'l Sec., Inc.*, 466 F.3d 298, 307 (4th Cir. 2006). Here, the payment and routes were negotiated and determined by the Defendant—the drivers had no opportunity to increase profit through the skillful selection of routes, etc. The Defendant attempts to press the argument that a driver could increase profitability through the purchase of a more fuel-efficient vehicle, but such a choice (particularly for a personal vehicle) does not amount to an exercise of managerial skill. *Collinge*, 2015 WL 1299369, at *5. Relatedly, although the Defendant emphasizes that a driver's fixed expenses (such as the fixed, weekly fees imposed by the Defendant) could become more efficient (resulting in greater profit) when the driver took more routes, courts refuse to accept such arguments because they are akin to a waiter's ability to make more money from taking more shifts—that is not an exercise of managerial skill. *See Solis v. Kansas City Transp. Grp.*, No. 10-0887-CV, 2012 WL 3753736, at *9 (W.D. Mo. Aug. 28, 2012). This factor weighs in favor of employee status, not independent contractor status.

**4.      Undisputed Facts Relevant to the Drivers' Special Skills**

The Defendant required drivers to have a valid license, pass a physical examination and drug test, pass a criminal background check, and have a clean driving record. DE 26 at 8. Drivers also had to provide the Defendant with documentation that they had passed certification courses for CPR and defensive driving. *Id.*

Analysis of the Drivers' Special Skills

The Defendant concedes that the drivers did not utilize special skills and, as a result, this factor favors employee status. DE 32.

**5.      Undisputed Facts Relevant to the Degree of Permanency and Duration of Work**

The amount of time at issue in this case is 30 months. DE 26 at 8.  Within that 30 months, the drivers' average length of employment with the Defendant was 11 months, with 24 drivers working for 1 year or longer. *Id.* at 9.  The drivers did not work for other employers during their workhours with the Defendant,[11] although some drivers did work for other employers during non-work hours. *Id.*

<u>Analysis of the Degree of Permanency and Duration of Work</u>

The Defendant argues that the relatively short duration of average employment in this case—11 months—means that there is a low amount of permanency in this case, which would favor independent contractor status.  As the Department points out, however, the Defendant only operated the business at issue in this case for 30 months, which puts the average duration of 11 months in a different light.  Relatedly, the Defendant emphasizes that some of its drivers worked for other companies during the hours that they were not working for the Defendant.  The Court fails to see how that fact weighs strongly in favor of independent contractor status.  As one court explained:

> While it is certainly true that the nurses enjoy a degree of flexibility in their working lives, not shared by many in the work force, including an enhanced ability to "moonlight" by working for more than one agency at a time and by choosing when and where to make themselves available for work, the simple fact remains that **when the nurses are available for work they are dependent upon Nursetemps to provide it, and when they are working on assignment for Nursetemps they are, during those workweeks, employees of Nursetemps**.

---

11 The evidence in support of the Defendant's response to the Department's statement of fact on this issue does not rebut the proposition that the drivers did not work for other employers during their work hours with the Defendant. DE 32-1 at 1 ("I also drive for Uber occasionally on the weekends."); DE 32-3 at 1 (not clarifying *when* the driver worked for Lyft); DE 32-5 at 1 ("If I don't have a lot of work for Medi-Wheels, I drive for Uber."); DE 32-8 at 137 ("And, you know, people would call up and say things, or they would disappear for a day or whatnot, because they weren't around and they were out doing an Uber ride or would go to the airport for some other business.").  Relatedly, as set forth in the Motion and Reply the Defendant has failed to create a dispute of material fact with its evidentiary citations on the issue of "personal" transportation services. *See* DE 34 at 4.

*Solis v. A+ Nursetemps, Inc.*, No. 5:07-CV-182, 2013 WL 1395863, at *7 (M.D. Fla. Apr. 5, 2013) (emphasis added).  Just so here, as the Defendant has not provided evidence that its drivers were able to work for other companies during the Defendant's workhours.  The Court concludes that this factor may weigh slightly in favor of employee status but, at best with all reasonable inferences in the Defendant's favor, this factor is neutral and does not weigh in support of any particular finding.

**6.      Undisputed Facts Relevant to Whether the Drivers' Services were Integral to the Defendant**

During the time at issue in this case, approximately 25% of the Defendants' revenues were based upon the drivers' activities. DE 26 at 9.

<u>Analysis of the Degree of Permanency and Duration of Work</u>

The Defendant concedes that the drivers were integral to its business.  As a result, this favor weighs in favor of employee status.

**7.      The Court's Final Analysis of the Economic Reality Test Factors and Liability**

Even after the Court views the undisputed record evidence in the light most favorable to the Defendant, the economic reality test factors weigh strongly in favor of a conclusion that the drivers were employees, not independent contractors.  Indeed, this case does not raise a close question.

Nor is this case unique.  The Department cites to many cases where it and other plaintiffs have prevailed on summary judgment on similar record evidence, and the case of *Solis v. Kansas City Transportation Group* is a good example since its facts are very similar to the instant case. No. 10-0887-CV, 2012 WL 3753736 (W.D. Mo. Aug. 28, 2012).

In *Solis*, the defendant contracted with various companies for medical transportation. *Id.* at *1. The defendant negotiated the compensation for transportation with its clients, and it hired drivers—whom it classified as independent contractors—to fulfill its obligations under its contracts. *Id.* The defendant required its drivers to wear uniforms, and it created and assigned the routes for the drivers. *Id.* at *2. Just like the instant case, the parties disputed the extent to which a driver could refuse a route. *Id.* If a driver did not comply with the defendant's rules, a client could not fine the driver directly. *Id.* Instead, the client could fine the defendant who in turn would pass the fine onto the driver. *Id.* The defendant required the drivers to take various tests. *Id.* at *5.

Citing a "total lack of driver control," the *Solis* court found that the control factor weighed in favor of employee status. *Id.* at *8. The *Solis* court also found that the opportunity for profit, investment, skills, and integral factors weighed in favor of employee status, with the permanency factor not weighing in favor of any particular determination. *Id.* at *9-10.

Although the Department relied upon *Solis* at oral argument, the Defendant did not attempt to distinguish the case. Instead, in its Response, the Defendant principally relied upon an unpublished case decided at the Eleventh Circuit, *Freund v. Hi-Tech Satellite, Inc.*, 185 F. App'x 782 (2006), but that case is not similar to the instant case.

*Freund* involved a satellite installation worker. *Id.* at 784. There, most of the economic reality tests favored independent contractor status: the worker had special skills to install complicated equipment, he had made a significant investment in the tools necessary for the installations, and he had a significant opportunity for profit in that, through the improvement of his own expertise, he could complete his jobs faster (being paid by the job, not by the hour). *Id.* at 783-84. Notably, the worker in *Freund* had the freedom to reschedule any work that was assigned

to him by the defendant.[12] *Id.* at 783.   Finally, although the worker in *Freund* did not utilize a corporate entity for business, several of his coworkers did. *Id.*   On that record, the trial court concluded that "five of the six factors . . . overwhelmingly" supported independent contractor status. *Freund v. Hi-Tech Satellite, Inc.*, No. 04-CV-80117 (S.D. Fla. June 10, 2005).

This is not a case resembling *Freund*; this is not a case about a skilled worker who, having the flexibility to reschedule any work assigned to him, purchased his own tools and had the opportunity, through his ever-enhancing skill, to improve his own profit.   Instead, this is a case like *Solis*, where a defendant has exerted considerable control over unskilled medical transportation drivers because of contracts that it had previously negotiated with clients.

Consistent with its contracts, the Defendant in this case in turn placed the burden of its contractual obligations upon its drivers, via a mandatory, ever-renewing contract.   Also consistent with the Defendant's contractual obligations with its clients, the Defendant controlled all of the meaningful aspects of the driving service: it set the routes, which had minimal flexibility; it required training, which was mandatory; it tracked the drivers with GPS and cameras, which were also mandatory; and it passed on damages from the client to the driver.   Juxtaposed to all of the Department's undisputed record evidence, the Defendant's emphasis on the drivers' ability to work as little as they chose, or to moonlight during their off-work hours, is simply insufficient. When the drivers worked for the Defendant, the drivers functioned as employees.   With the Court's determination on liability in hand, the Court turns to the question of damages.

---

12 Because the worker had the freedom to reschedule any work assigned to him, there is a strong inference in the case that the worker could complete jobs for other companies *during the workday*.

### III.    Damages

Because the Defendant's drivers were employees as a matter of law, the drivers were entitled under the Fair Labor Standards Act to both overtime pay and, in some instances, a minimum wage.  However, because the Defendant did not classify its drivers as employees, it did not keep records of the amount of time the drivers worked. DE 26 at 10; DE 32 at 5.  The Defendant's lack of recordkeeping was unlawful,[13] and the Defendant's unlawful record retention policy means that the Department's ability to quantify the drivers' damages has been impaired. The Supreme Court addressed such a situation in *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946).

In *Anderson*, the Supreme Court held that a "fair standard must be erected for the employee to meet in carrying out his burden of proof" when the defendant fails to do so. *Id.* at 687.  That standard is that an employee "has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Id.*  If an employee meets the initial burden, the burden will shift to the employer to come forward with evidence "of the precise amount of work performed or with evidence to negative [sic] the reasonableness of the inference to be drawn from the employee's evidence." *Id.*  If the employer fails to come forward with such evidence, a court may award damages to the employee, even if "the result be only an approximate." *Id.* at 688.

<u>The Department's Evidence</u>

Here, the Department has met its initial burden to estimate the amount for with the drivers were improperly compensated.  It has done so by using the software that the Defendant used to

---

[13] 29 U.S.C. §§ 11(c), 15(a)(5), 211(c), 215(a)(5).

schedule its drivers' routes.  It is undisputed that: (i) the software did not build "break time" into the drivers' assigned routes and (ii) the drivers were not compensated for driving with an empty vehicle or for client no-shows. DE 26 at 7, 10.[14]  The mandate of the Defendant's software system was efficiency—the software attempted to maximize the amount of time each driver spent driving:

> Q.  I know that Medi-Wheels didn't guarantee any
> specific number of trips per day.  But if a driver
> were available to do rides all day and there were lots
> of rides to give out would TransTrack assign
> back-to-back rides for a full 12 hours?
>
> A.  I don't think it would have scheduled trips
> for that duration.  But, I mean, conceptually
> speaking, if we say somebody is available from 6 a.m.
> until 10 at night, would it try to fill in those gaps?
> Yes.  I don't know that there would ever be a trip
> distribution that could do all of that.  But, I mean,
> conceptually speaking, that's how it would work.

DE 32-8 at 104.

Using the Defendant's software data and using the drivers' first and last assigned trips each day to compute hours worked, the Department estimates the drivers' damages to be $384,589.[15] DE 26 at 13.  For all of the reasons set forth above and in the Department's Motion and Reply, the Court is persuaded that the Department has produced sufficient, undisputed evidence at summary judgment that the drivers performed work, that they were unfairly compensated for that work, and

---

14 It is also possible that it is undisputed that "the software data shows that drivers did not have much time between their assigned trips," but the Defendant's response to this proffered fact is sufficiently confusing that the Court is uncertain whether the Defendant has conceded the point. DE 266 at 7.

15 The Defendant does not dispute the Department's math, rather the Defendant disputes the methodology the Department used to perform its calculations—that the drivers should be compensated for the entire duration of each day.

that the Department's damages estimate fairly approximates the "amount and extent of that work as a matter of just and reasonable inference."  In short, the Department has met its initial burden under *Anderson* and at summary judgment to fairly approximate the drivers' damages, given that the Defendant did not keep records of the drivers' time.

<u>The Defendant's Evidence</u>

The evidentiary burden therefore shifts to the Defendant, pursuant to *Anderson*, to provide evidence "of the *precise* amount of work performed or with evidence to *negative* [sic] *the reasonableness of the inference* to be drawn from the employee's evidence." *Anderson*, 328 U.S. at 687 (emphasis added).  Additionally, the Defendant has the summary judgment burden to provide evidence from which a reasonable trier of fact could find in the Defendant's favor. *E.g., Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002); *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990).  To meet these two burdens, the Defendant cites to three pieces of evidence.  Each is addressed in turn, each is highlighted in **bold**, and each is insufficient to resist summary judgment.

**First**, the Defendant cites to one question and answer from the deposition of a manager, Mr. Dominick Tocci. DE 32 at 6. 10.  That answer is very vague and reads as follows:

16

> Q.   Did the software build in any break time or
> meal time?  Were drivers required to have a certain
> amount of the day that they weren't driving so they
> could have a break?
>
> A.   Once again, the drivers did whatever they
> wanted on the streets.  So, I mean, they could have
> had breaks in the morning, at night.  There would be
> times where we called them up and asked them are you
> on your way there and they're sitting down eating
> somewhere or they're doing a trip somewhere else, or
> whatever they were doing.  I mean, it was their
> own... .  They were contractors.  We weren't
> scheduling them as employees.

DE 32-8 at 104.  Mr. Tocci's testimony references what the drivers "could have" done with their time because the drivers "did whatever they wanted."  As a result, Mr. Tocci testified that the drivers could have had breaks "in the morning" or "at night."

This vague testimony must be juxtaposed to the evidence in support of the Department's Motion.  The Department established with undisputed evidence that the Defendant did not schedule any time into the routes for the drivers to have breaks.  Instead, the Defendant's scheduling system prioritized the most efficient usage of the drivers' time (from the Defendant's perspective) as possible.  For these reasons, the Court previously concluded that, under *Anderson*, the drivers were entitled to the inference that all of their work time was compensable.  If a trier of fact were to rely upon the vague testimony of Mr. Tocci, as quoted above, to find in the Defendant's favor on this issue, that trier of fact would be unreasonable due to the complete lack of specifics (and personal knowledge) on behalf of Mr. Tocci, a manager for the Defendant.

How did Mr. Tocci know that a driver was on a break?  Did all, or only some, of the drivers take breaks?  How often did the drivers get breaks?  Were the breaks short enough[16] that they were nonetheless compensable time?  If not, how long were the breaks?  How often did the drivers "do what they wanted?"  Without this information—without any specifics—any finding in favor of the Defendant on this issue would be completely arbitrary and speculative. *See Lehrman v. Gulf Oil Corp.*, 500 F.2d 659, 668 (5th Cir. 1974) (damages cannot be based upon speculation); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.").  The question before the Court is not whether the Defendant could obtain better evidence on damages prior to trial. *See Chapman v. Al Transport*, 229 F.3d 1012, 1027 (11th Cir. 2000) ("Parties opposing summary judgment are appropriately charged with the responsibility of marshaling and presenting their evidence before summary judgment is granted, not afterwards.").  Instead, the Court must rule based upon the evidence the Defendant has cited now. Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials.").  The operative question is whether, using the Defendant's cited summary judgment evidence, a reasonable trier of fact could find in the Defendant's favor.  As for the testimony quoted above, the answer is no.

**Second**, the Defendant cites to two paragraphs in Mr. Tocci's declaration.  Those paragraphs focus on the period of time between a driver's drop-off and a driver's new pick-up.  The paragraphs read as follows:

> Based on my experience, I know that drivers often had downtime of more than 30 minutes between trips, during which time they were free to take breaks and meals. Indeed, even when there were not more than 30 minutes between scheduled trips,

---

16 The Defendant concedes that breaks shorter than twenty minutes would count as compensable time. DE 31 at 13.

drivers often took 30 minutes or more to eat, and would arrive late to the next scheduled trip. Drivers were typically not penalized for being late.

I reviewed at random the Transitrak data for one of the drivers Earnest Alfred. Mr. Alfred was selected not because his driving behavior was different from the other drivers but simply because his name appeared first alphabetically. Based on my review of his logged driving activity reflected in Transitrak, Mr. Alfred worked with Medi-Wheels from March 5, 2021 to August 4, 2022 (approximately 74 work weeks). During that time, Mr. Alfred was compensated for 3,338 passenger trips. The Transitrak data indicated that there were 1,482 situations where the gap between drop off and pickup on rides on the same day were 20 minutes or more. On 422 situations, the gap exceeded one hour.

DE 32-7 at 2. Unlike Mr. Tocci's deposition testimony, this evidence does contain some specifics. The problem for the Defendant, however, is that this information is irrelevant or, in the alternative, this information, without more, is insufficient to resist summary judgment. Through its reliance on this evidence, the Defendant improperly implies, without legal or factual substantiation, that the drivers should not be compensated for the gap of time between the end of one trip and the start of another.

That is contrary to the law. 29 C.F.R. § 785.38 ("[T]ravel from job cite to job cite during the workday must be counted as hours worked."). Employee-drivers must be compensated for their travel time from one job to another. *Id.* And while it may be true that, under hypothetical facts, not *all* of the travel time would be compensable, the Defendant fails to make any argument or cite to any evidence on this point.

By way of a hypothetical example, perhaps the distance between two jobs was small, and the amount of time for the driver to make the trip was large. Based upon that hypothetical, not all of the driver's transit time would be compensable. But how would a reasonable trier of fact evaluate this hypothetical possibility, using Mr. Tocci's declaration? Mr. Tocci does not estimate the average amount of distance between drivers' trips, the average amount of time necessary to

travel the distance in south Florida traffic, and the average amount of time allotted to the drivers to complete the trip.  Nor does Mr. Tocci provide a concrete example of one driver's route on one day and explain how, using that example, not all of the driver's time would be compensable.  Without this missing information, then, how would a reasonable trier of fact estimate the drivers' non-compensable time?  It would be through speculation and conjecture.  Furthermore, juxtaposed to Mr. Tocci's lack of specificity is the testimony of drivers[17] that they "don't even have time to go to the bathroom to pee." DE 26-5 at 11.  Mr. Tocci's declaration is insufficient for the Defendant to resist the Department's Motion for Summary Judgment.

**Third** and finally, the Defendant relies upon two sentences from a driver's declaration. The Defendant relies upon the two sentences for the proposition that sometimes drivers would have free time during a workday that was not compensable.  Those sentences read as follows:

> I usually start early in the morning and work until 5 pm or so. During the day, if I have downtime, I will go home and take a nap or do chores.

DE 32-1 at 2.  As with Mr. Tocci's deposition testimony, the driver's declaration is vague.  The declaration contains no information on how often the driver would have free time, how long the driver would nap during the free time, etc.  Even so, because the driver's declaration is at least made by a driver with personal knowledge, this evidence comes the closest to creating a question of fact.  For the reasons outlined below, however, this evidence is still insufficient for the Defendant to resist summary judgment.

Implicit in the Defendant's reliance upon the driver's declaration is the legal position that, when drivers had a substantial amount of time after a drop-off and prior to a pick-up (such as a passenger's long medical appointment), the driver's time was not compensable.  That is potentially

---

17 The Department's record evidence also includes a declaration from its investigator that, upon a detailed inspection of the drivers' schedules, the drivers did not have time to take breaks. DE 26-3 at 4.

contrary to the law.   An employee who is engaged to wait for additional work must be

compensated. 29 C.F.R. § 785.16(a).  As explained in the federal regulations:

> A stenographer who reads a book while waiting for dictation, **a messenger who works a crossword puzzle while awaiting assignments**, fireman who plays checkers while waiting for alarms and a factory worker who talks to his fellow employees while waiting for machinery to be repaired are all working during their periods of inactivity. **The rule also applies to employees who work away from the plant**. For example, **a repair man is working while he waits for his employer's customer to get the premises in readiness**. The time is worktime even though the employee is allowed to leave the premises or the job site during such periods of inactivity. The periods during which these occur are unpredictable. They are usually of short duration. In either event the employee is unable to use the time effectively for his own purposes. It belongs to and is controlled by the employer. In all of these cases waiting is an integral part of the job. **The employee is engaged to wait**.

*Id.* (emphasis added).  Returning to a hypothetical, suppose a driver had two hours between a

drop-off and a pick-up at a passenger's medical appointment.  Further suppose that the driver, in

lieu of leaving or driving elsewhere for personal time, remained in park at the pick-up location,

awaiting the return of the passenger.  Would the driver's time waiting be compensable?  Although

the Defendant has not briefed this issue, the Court believes that the time spent waiting would be

compensable because the driver, as an employee, had been "engaged to wait" by the Defendant for

the pick-up. *See id.*  To be sure, the Defendant has provided evidence that at least one driver

sometimes elected not to wait and, instead, took some personal time at her home.  But, again, how

would a reasonable trier of fact estimate the non-compensable time, particularly in light of the fact

that there is undisputed evidence in the record that drivers were sometimes assigned additional

work in the middle of the workday?

Were drivers performing personal tasks nonetheless on-call for additional duties, like a

fireman?  Were the drivers instead using the time "for their own purposes?"  Was it some mixture

of the two?  If drivers were using at least some of the time for their own purposes, how would a reasonable trier of fact estimate the amount of non-compensable time?  Again, it would be through speculation and conjecture, because the driver's declaration does not clarify whether she was affirmatively told she was off duty, whether she was still on-call for additional assignments, how often she had free time, how long she had free time, etc.  And the Defendant certainly has not cited to any evidence on these points from other drivers.

The Court's Final Analysis on Damages

In conclusion, a reasonable trier of fact would need a certain amount of information to find in favor of the Defendant on the issue of non-compensable time, lest the trier of fact resort to conjecture and speculation.  The Defendant has not cited to that information, and what the summary judgment record evidence reasonably supports is that the Defendant either did not attempt to answer the germane damages questions before the Court or the Defendant cannot answer the questions, but the reason the Defendant would be unable to cite to evidence on this issue is because the Defendant lacks the necessary records to do so; *Anderson* is clear on how damages may be computed when there are no records—damages may be an approximation—and *Anderson* places the evidentiary burden to negate the approximation on the employer, not the employee.

To be clear, the Defendant's summary judgment citations are not merely insufficient because of the summary judgment standard.  They are also insufficient under *Anderson* because the evidence lacks the requisite precision and because the evidence is insufficient to negate the reasonable inferences in the Department's favor, given that the drivers, through no fault of their own, have been deprived of the Defendant's records to substantiate a claim for damages and given

that the drivers, as a result of the Defendant's schedules, were not allocated time to take a break. For all of the reasons set forth above, in the Motion, and in the Reply, the Court is persuaded that the Department has met its summary judgment burden to prove, through estimation and approximation, damages in the amount of $384,589, and that the Defendant has failed to adequately respond to the Department's evidence.   Accordingly, the Court enters summary judgment and an injunction[18]  in favor of the Department.

Relatedly, also for the reasons set forth in the Motion and Reply, additional liquidated damages of $384,589 are appropriate in this case. Liquidated damages are required unless an employer can show that it acted in good faith. 29 C.F.R. § 790.22.  The employer's good-faith requirement has both an objective and subjective component. *Dybach v. Fla. Dep't of Corr.*, 942 F.2d 1562, 1566 (11th Cir. 1991).  Further, "good faith requires some duty to investigate potential liability under the FLSA." *Barcellona v. Tiffany English Pub, Inc.*, 597 F.2d 464, 469 (5th Cir. 1979).  Here, even if the Defendant has evidence of a subjective good faith belief, the Defendant has cited to no valid evidence to objectively justify its belief that its drivers could be reclassified as independent contractors, and it is undisputed in this case that the Defendant, prior to its reclassification, did not consult with a third party, did not refer to any publications, and sought no guidance on its decision. DE 26 at 11.  The Defendant, in short, conducted no investigation prior to its decision to reclassify its employees.  Finally, consistent with the Defendant's concession that, should it lose on liability for the reasons outlined above, none of its affirmative defenses otherwise bar the entry of summary judgment, DE 31 at 16, the Court will proceed to the entry of summary judgment as the Department has requested.

---

18 Because the Defendant has refused to concede that its reclassification of its drivers as independent contractors was unlawful, the Department is entitled to an injunction prohibiting the practice in the future.

### IV.    Final Ruling

It is therefore **ORDERED AND ADJUDGED** that the Department's Motion for Summary Judgment at docket entry 27 is **GRANTED**.  The Department shall submit a proposed final judgment and injunction in Microsoft Word format, after conferral with the Defendant, within three business days of the date of rendition of this order to rosenberg@flsd.uscouts.gov. The Clerk of the Court shall **CLOSE THIS CASE**.

**DONE and ORDERED** in Chambers, West Palm Beach, Florida, this 28th day of March, 2024.

ROBIN L. ROSENBERG
UNITED STATES DISTRICT JUDGE

Copies furnished to: Counsel of Record

24